# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 OCT 22  PM 2: 46

CLERK

BY _____
DEPUTY CLERK

| | |
|---|---|
| STATE OF VERMONT, | |
| Plaintiff, | |
| v. | |
| EXXON MOBIL CORPORATION, EXXONMOBIL OIL CORPORATION, ROYAL DUTCH SHELL PLC, SHELL OIL COMPANY, SHELL OIL PRODUCTS COMPANY LLC, MOTIVA ENTERPRISES LLC, SUNOCO LP, SUNOCO LLC, ETC SUNOCO HOLDINGS LLC, ENERGY TRANSFER (R&M) LLC, ENERGY TRANSFER LP, and CITGO PETROLEUM CORPORATION, | |
| Defendants. | |

Case No. 2: 21-CV-260

Date:

## NOTICE OF REMOVAL

# TABLE OF CONTENTS

Page

NOTICE OF REMOVAL ................................................................................................. 1

TIMELINESS OF REMOVAL ....................................................................................... 2

NATURE OF THE ACTION .......................................................................................... 3

GROUNDS FOR REMOVAL......................................................................................... 14

I.      The Attorney General's Claims Are Governed by Federal Common Law and
        Therefore Are Subject to Removal. .................................................................... 15

        A.      The Attorney General's Claims Necessarily Arise Under Federal Common
                Law. ......................................................................................................... 16

                1.      The Attorney General's Claims Implicate Transboundary
                        Pollution............................................................................................ 17

                2.      The Attorney General's Claims Implicate Foreign Affairs. ................. 24

        B.      The Artful Pleading Doctrine Supports This Court's Jurisdiction........................ 30

        C.      Jurisdiction Over Claims Governed by Federal Common Law Is
                Independently Authorized by *Grable*. .................................................... 32

II.     This Action Is Removable Under *Grable* Because It Raises Other Contested
        Federal Issues................................................................................................... 35

III.    This Action Is Removable Under the Federal Officer Removal Statute. .......... 41

        A.      Courts Construe the Federal Officer Removal Statute Broadly in Favor of
                Removal. .................................................................................................. 41

        B.      Defendants Satisfy All Elements of the Federal Officer Removal Statute. .......... 43

                1.      Defendants "Acted Under" Federal Officers. .......................................... 44

                2.      The Attorney General's Claims Are Related to Defendants'
                        Activities "Under Color of Federal Office."........................................... 74

                3.      Defendants Have Colorable Federal Defenses. ...................................... 79

IV.     This Action Is Removable Under the Outer Continental Shelf Lands Act....................... 81

V.      This Action Arises Out of Federal Enclaves...................................................... 86

VI.     This Court Has Diversity Jurisdiction Because the Real Parties in Interest Have
        Diverse Citizenship........................................................................................... 89

COMPLIANCE WITH OTHER REMOVAL REQUIREMENTS ............................................. 92

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation hereby remove this action from the Superior Court of Vermont, Chittenden Unit, to the United States District Court for the District of Vermont pursuant to 28 U.S.C. §§ 1331, 1332(a), 1441, 1442(a), and 43 U.S.C. § 1349(b)(1). To the extent any part of the Attorney General's causes of action can be construed as nonfederal, this Court has supplemental jurisdiction over them under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as those causes of action over which the Court has original jurisdiction. All other defendants that have been properly joined and served, or purported to be served, have consented to this Notice of Removal.[1]

This lawsuit seeks relief for harms associated with climate change. The Attorney General alleges Defendants have "known for decades" that fossil fuels are "the primary source" of climate change. Compl. ¶ 2. The Complaint goes on to accuse Defendants of keeping that "information a secret" and contends that consumers would have made "other energy-related choices" that mitigated climate change if only Defendants had told the truth. *Id.* ¶ 4. In the Attorney General's view, any promotion of fossil fuels is inherently misleading because "the use of Defendants' fossil fuel products will contribute to global warming, sea level rise, disruptions to the hydrologic cycle, increased extreme precipitation, heatwaves, drought, and other consequences of the climate crisis." *Id.* ¶ 179. Climate change, fossil fuel's alleged contributions to climate change, and statements promoting fossil fuel form the heart of the Attorney General's Complaint.

---

[1]   By filing or consenting to this Notice of Removal, Defendants do not waive any right, defense, affirmative defense, or objection, including without limitation any challenges to personal jurisdiction, insufficient process, and/or insufficient service of process. *See, e.g.*, *Rivera* v. *Bally's Park Place, Inc.*, 798 F. Supp. 2d 611, 615–16 (E.D. Pa. 2011). Where used in this Notice, "Defendants" refers to two or more defendants named in this lawsuit.

Such lawsuits are properly removed to federal court because the claims asserted are governed by federal, not state, law. In a related case, the Second Circuit recently held that federal common law governs claims seeking redress for global climate change, regardless of the plaintiff's chosen claims, because climate change is a "uniquely international problem" that is "not well-suited to the application of state law." *City of New York* v. *Chevron Corp.*, 993 F.3d 81, 85-86 (2d Cir. 2021) ("*City of New York II*"). Although the City of New York argued that its case concerned only the "production, promotion, and sale of fossil fuels," the Second Circuit explained that "artful pleading" could not "transform" the complaint into "anything other than a suit over global greenhouse gas emissions" governed by federal law. *Id.* at 91. Nor could the City "disavow[] any intent to address emissions" while "identifying such emissions" as the source of its harm. *Id.*

According to the Second Circuit, federal common law governs where, as here, the Attorney General challenges Defendants' promotion of fossil fuel products because they allegedly "will cause catastrophic effects on the environment *if unabated.*" Compl. ¶ 118 (emphasis added). Put another way, the Attorney General functionally seeks to shift consumer demand from fossil fuels to alternative sources of energy in order to abate emissions and climate change, substituting his policy judgment for decisions by the federal government about national and international energy policy. A suit of this importance, which implicates a host of federal issues and asserts claims that can only be resolved under federal law, should be heard by a federal court.

## TIMELINESS OF REMOVAL

1.      The City filed this action in the Superior Court of Vermont, Chittenden Unit, on September 14, 2021. No Defendant was served or purportedly served prior to October 4, 2021.

2.      This Notice of Removal is timely because it is filed within 30 days of service. *See* 28 U.S.C. § 1446(b).

## NATURE OF THE ACTION

3.    Despite couching this action as an effort to protect Vermont consumers from deceptive marketing, the Attorney General's true goal in bringing this action is to limit and ultimately end Defendants' production, promotion, and sale of fossil fuels because of their purported connection to alleged injuries stemming from global climate change.

4.    This lawsuit arises from a coordinated attempt to regulate global greenhouse gas emissions and shape energy policy—a role reserved exclusively to the federal government in our constitutional system.  In early 2016, a coalition of state attorneys general, including the Vermont Attorney General, entered into a "Climate Change Coalition Common Interest Agreement" purportedly in furtherance of their shared interest in "*limiting* climate change" and "ensuring the dissemination of *accurate* information about climate change."  Ex. 1 at 1 (emphases added).[2] Those state and local government officials—approximately 20 in number—called themselves the "Green 20."[3]

5.    On March 29, 2016, the Green 20 held a press conference titled, "AGs United for Clean Power," which was co-organized by then-Vermont Attorney General William Sorrell.  Ex. 2 at 1.  Noting the perceived "gridlock in Washington," the New York Attorney General promoted "collective efforts to deal with the problem of climate change" and urged his colleagues to "step into this [legislative] breach" through the "creative[]" and "aggressive[]" use of their respective

---

[2]    "Ex." refers to an Exhibit attached to this Notice of Removal.

[3]    The parties to the Climate Change Coalition Common Interest Agreement included the attorneys general of California, Connecticut, Delaware, the District of Columbia, Iowa, Illinois, Maryland, Massachusetts, Maine, Minnesota, New Hampshire, New Mexico, New York, Oregon, Rhode Island, Virginia, Vermont, Washington, and the U.S. Virgin Islands. *See* Ex. 1 at 3–19; Ex. 2 at 1.

offices to target the fossil fuel industry. *Id.* at 1–3.[4] The Vermont Attorney General embraced New York's invitation, saying climate change "is the environmental issue of our times" and "Vermont is stepping up and doing its part." *Id.* at 5.

6. The "AGs United for Clean Power" was the product of a strategy that climate activists and special interests developed years earlier. This strategy first emerged during a "Workshop on Climate Accountability, Public Opinion, and Legal Strategies" held in La Jolla, California in June 2012. Ex. 4. Participants at the La Jolla conference—including a representative from the California Attorney General's Office—discussed using civil litigation and enforcement authority to "maintain[] pressure on the [fossil fuel] industry that could eventually lead to its support for legislative and regulatory responses to global warming." *Id.* at 27. Some participants noted that "pressure from the courts offers the best current hope for gaining the energy industry's cooperation *in converting to renewable energy.*" *Id.* at 27–28 (emphasis added). The attendees concluded that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light" that could be used to coerce companies to change their positions on climate change and energy policy. *Id.* at 11. They also conceived of civil litigation as a vehicle for regulating emissions and ultimately shutting down the fossil fuel industry. As one commentator observed: "Even if your ultimate goal might be to shut down a company, you still might be wise to start out by asking for compensation for injured parties." *Id.* at 13.

7. Following the La Jolla conference, and in the lead up to the "AGs United for Clean Power" press conference, the state attorneys general met with climate activists who had

---

[4]   This press conference drew criticism from thirteen other state attorneys general, who viewed the intentions expressed by the Green 20 as an attempt to use "law enforcement authority to resolve a public policy debate." Ex. 3 at 3.

participated in the La Jolla conference.[5]  One of those activists, Matthew Pawa, had a few months

earlier attended a meeting at the Rockefeller Family Fund to discuss an "Exxon campaign" to

undermine ExxonMobil's ability to do business.  Ex. 6 (*available at* https://freebeacon.com/wp-

content/uploads/2016/04/scan0003.pdf).  The campaign's goals included:

- "delegitimiz[ing] [Exxon] as a political actor,"

- "establish[ing] in [the] public's mind that Exxon is a corrupt institution that has

  pushed humanity (and all creation) toward climate chaos and grave harm," and

- "driv[ing] divestment from Exxon."  *Id.*

8.     Over the next several years, the state attorneys general associated with the Green

20 filed lawsuits against energy companies, all with the goal of limiting—if not terminating—their

production, promotion, and sale of fossil fuels, including by stifling speech on policy issues.[6]  The

first of these lawsuits, brought by the New York Attorney General against ExxonMobil, went to

trial in October 2019, and resulted in a complete defense verdict.  Justice Ostrager, who presided

over the trial, found the State's allegations to be "without merit," and its complaint to be

"hyperbolic" and the "result of an ill-conceived initiative of the Office of the Attorney General."

*People* v. *Exxon Mobil Corp.*, 2019 WL 6795771, at *1–2, *26 (N.Y. Sup. Ct. Dec. 10, 2019).

---

[5]   These presentations were not only closed to the public; the attorneys general also directed the participants to conceal their attendance.  *See* Ex. 5 at 1 ("My ask is if you speak to the reporter, to not confirm that you attended or otherwise discuss the event.").

[6]   *See State of Delaware* v. *BP America Inc.,* No. N20C-09-097 AML (Del. Super. Ct. Sept. 10, 2020); *State of Connecticut* v. *Exxon Mobil Corp.*, No. 20-6132568-S (Conn. Super. Ct. Sept. 14, 2020); *State of Minnesota* v. *Am. Petroleum Inst.*, No. 62- CV-20-3837 (Minn. Dist. Ct. June 24, 2020); *District of Columbia* v. *Exxon Mobil Corp.*, No. 20-2892 (D.C. Sup. Ct. June 25, 2020); *Commonwealth* v. *Exxon Mobil Corp.*, No. 19-3333 (Mass. Super. Ct. Oct. 24, 2019); *People* v. *Exxon Mobil Corp.*, No. 18-452044 (N.Y. Sup. Ct. Oct. 24, 2018); *State* v. *Chevron Corp. et al.*, No. 18-4716 (R.I. Super. Ct. July 2, 2018).

9.       Numerous municipalities, also seeking to shape national and international energy policy, have joined in the effort to file lawsuits against energy companies.[7]  A trial court in Texas recently concluded that these lawsuits amounted to a "crusade" against ExxonMobil "aimed to chill and suppress ExxonMobil's speech through legal actions and related campaigns."  *City of San Francisco* v. *Exxon Mobil Corp.*, 2020 WL 3969558, at \*3, \*8 (Tex. App.  June 18, 2020) (internal quotation marks omitted).  A Texas appellate court likewise expressed dismay over California municipalities' "[l]awfare," which it considered "an ugly tool by which to seek the environmental policy changes the California Parties desire, enlisting the judiciary to do the work that the other two branches of government cannot or will not do."  *Id.* at \*20.

10.       The Vermont Complaint does little to mask the core purpose of the Attorney General's lawsuit—namely, to force reductions in fossil fuel production, promotion, and sales.  For example, the Complaint from the outset alleges that fossil fuel combustion is the primary driver of anthropogenic climate change:

---

[7]    *See Anne Arundel County* v. *BP PLC*, No. C-02-CV-21-000565 (Md. Cir. Ct. Apr. 26, 2021); *City of New York* v. *Exxon Mobil Corp.*, No. 451071/2021 (N.Y. Sup. Ct. Apr. 22, 2021); *City of Annapolis* v. *BP PLC*, No. C-02-CV-21-000250 (Md. Cir. Ct. Feb. 22, 2021); *County of Maui* v. *Sunoco LP*, No. 2CCV-20-0000283 (Haw. Cir. Ct. Oct. 12, 2020); *City of Charleston* v. *Brabham Oil Co. et al.*, No. 2020-CP-10-03975 (S.C. Ct. Comm. Pl. Sept. 9, 2020); *City of Hoboken* v. *Exxon Mobil Corp. et al.*, No. HUD-L-003179-20 (N.J. Super. Ct. Sept. 2, 2020); *City & County of Honolulu* v. *Sunoco LP*, No. 20-380 (Haw. Cir. Ct. Mar. 9, 2020); *Mayor & City Council of Baltimore* v. *BP p.l.c.*, No. 18-4219 (Md. Cir. Ct. July 20, 2018); *King County* v. *BP p.l.c.*, No. 18-11859 (Wash. Super. Ct. May 9, 2018); *Bd. of Cnty. Comm'rs of Boulder Cnty.* v. *Suncor Energy (U.S.A.), Inc.*, No. 18-30349 (Colo. Dist. Ct. Apr. 17, 2018); *City of Richmond* v. *Chevron Corp.*, No. 18-55 (Cal. Super. Ct. Jan. 22, 2018); *City of New York* v. *BP p.l.c.*, No. 18-182 (S.D.N.Y. Jan. 9, 2018); *City of Santa Cruz* v. *Chevron Corp.*, No. 17-3243 (Cal. Super. Ct. Dec. 20, 2017); *County of Santa Cruz* v. *Chevron Corp.*, No. 17-3242 (Cal. Super. Ct. Dec. 20, 2017); *City of Oakland* v. *BP p.l.c.*, No. 17-87588 (Cal. Super. Ct. Sept. 19, 2017); *City of San Francisco* v. *BP p.l.c.*, No. 17-561370 (Cal. Super. Ct. Sept. 19, 2017); *City of Imperial Beach* v. *Chevron Corp.*, No. 17-1227 (Cal. Super. Ct. July 17, 2017); *County of Marin* v. *Chevron Corp.*, No. 17-2586 (Cal. Super. Ct. July 17, 2017); *County of San Mateo* v. *Chevron Corp.*, No. 17-3222 (Cal. Super. Ct. July 17, 2017).

- "Human influence has warmed the climate at a rate that is unprecedented in at least the last 2000 years." Compl. ¶ 1(b).

- "The main human influence" on climate change "is via ***combustion of fossil fuels*** and land use-change-related $CO_2$ emissions." *Id.* ¶ 1(d) (emphasis in original).

- "[C]arbon dioxide concentrations have increased by 40% since pre-industrial times, ***primarily from fossil fuel emissions***." *Id.* (emphasis in original).

- Of "[t]he $CO_2$ emitted from human activities during the decade of 2010-2019 . . . ***the combustion of fossil fuels was responsible for 81-91%***." *Id.* (emphasis in original).

- "Significant further global warming will occur in this century ***unless*** deep reductions in $CO_2$ and other greenhouse emissions occur in the coming decades." *Id.* (emphasis added) (internal quotation marks omitted).

The only solution, in the Attorney General's view, is to cease reliance on fossil fuels because "use of [Defendants'] fossil fuel products . . . is and remains a leading cause of global warming *and*, *unless abated*, will bring about grave consequences." *Id.* ¶ 98 (emphasis added).

11.    These allegations also make clear that the fundamental issue raised in the Complaint is not the accuracy of representations about the products being sold, but whether Defendants' products should be sold in reduced quantities or even sold at all. *See, e.g.*, Compl. ¶ 180 (noting that "continued increase in fossil fuel product consumption creates severe environmental threats and significant economic costs for communities, including the State of Vermont"); *id.* ¶ 120 (complaining that "Defendants' core businesses remain focused upon expanding the production, distribution, and sale of fossil fuel products that exacerbate climate change"); *id.* ¶ 126 ("Exxon has continued to ramp up fossil fuel production, and to plan for

unabated oil and gas exploitation indefinitely into the future."). The Complaint itself shows that this lawsuit is intended to curb global greenhouse gas emissions.

12.     The Complaint's allegations of harm further demonstrate the inextricable relationship between the Attorney General's claims and the production, promotion, and sale of fossil fuels. For example, the Complaint repeatedly warns that Defendants' "development, production, refining, and use of their fossil fuel products . . . *increases* greenhouse gas emissions and is a leading cause of global warming; and that *the continued use of these products will cause catastrophic effects on the environment if unabated*." Compl. ¶ 118 (emphasis added); *see also id.* ¶ 168 (alleging "the adverse consequences of climate change to which Defendants' products contribute, including rising sea levels, disruptions to the hydrologic cycle, increases in extreme precipitation, heatwaves, and droughts"); *id.* ¶ 43 (noting that "failure to reduce usage" of Defendants' fossil fuel products "would lead to potentially catastrophic effects to the climate, the environment, and the global economy, including significant changes in sea level, weather and ocean currents, extreme precipitation and drought, and resulting impacts on and loss of ecosystems, communities, and people"); *id.* ¶ 170 ("The use of Defendants' fossil fuel products, including for gasoline-powered cars and other vehicles, is a significant contributor to climate change, causing serious consequences for the environment.").

13.     The Attorney General alleges that Defendants' "fossil fuel products" have had a "grave impact . . . on the climate." Compl. ¶ 55. According to the Complaint, Defendants' promotion of their fossil fuel products has exacerbated climate change because it prevented consumers from making energy choices that could have resulted in lower emissions and less harm to the environment. *See, e.g., id.* ¶ 118 (alleging that Defendants' failure to disclose that the "use of their fossil fuel products . . . *increases* greenhouse gas emissions and is a leading cause of global

warming; and that the continued use of these products will cause catastrophic effects on the environment if unabated" was "material to the purchasing decisions of Vermont consumers"); *id.* ¶ 175 (alleging that consumers could have purchased "more fuel-efficient vehicles," used "public transit," reduced "fuel consumption," or stopped altogether using "Defendants' fossil fuel products"). The Attorney General cannot disavow any intent to abate greenhouse gas emissions when its requested relief is predicated on shifting consumer demand away from fossil fuels to lessen their alleged impact on the environment.

14.     As the Second Circuit recently held, lawsuits like this one challenging the promotion of fossil fuels because of their contribution to climate change are governed by federal law. *See City of New York II*, 993 F.3d at 91–92. In so holding, the Second Circuit rejected the City's argument that the case concerned only the "production, *promotion*, and sale of fossil fuels," but not the direct regulation of emissions. *Id.* at 91 (emphasis added). By targeting an "earlier moment" in the causal chain of emissions (including the promotion and marketing of fossil fuels), the City argued it was not seeking to directly regulate global emissions. *Id.* at 97. But, as the Second Circuit explained, the City's claims hinged on the link between fossil fuels releasing greenhouse gases and the effect of those emissions on the environment; "artful pleading" of claims could not "transform" the complaint into "anything other than a suit over greenhouse gas emissions" governed by federal common law. *Id.* at 91. Nor could the City "disavow[] any intent to address emissions" while "identifying such emissions" as the source of its harm. *Id.*

15.     The same reasoning supports federal jurisdiction here. The Attorney General seeks to hold Defendants liable for the harms stemming from climate change because Defendants' promotional activities allegedly prevented consumers from reducing their fossil fuel consumption. Indeed, the Attorney General expressly alleges that Defendants' conduct was "material[]" because

"Vermont consumers would choose to buy and consume lower quantities of [Defendants'] fossil fuel products, or perhaps stop buying them altogether." Compl. ¶ 2.

16.     While the Attorney General asserts that his claims are about deception and misrepresentation, they are clearly not. The Complaint merely reasserts functionally the same claims the Second Circuit held "must be brought under federal common law." 993 F.3d at 95. In *City of New York II*, the City claimed that defendants "ha[d] known for decades that their fossil fuel products pose a severe risk to the planet's climate," and yet "downplayed the risks and continued to sell massive quantities of fossil fuels, which has caused and will continue to cause significant changes to the City's climate." 993 F.3d at 86–87. Here, the Attorney General likewise claims that Defendants "have known for decades that the Earth's climate has been changing because of emissions of $CO_2$ and other greenhouse gases, and that the fossil fuels they sell are the primary source of those emissions," Compl. ¶ 2, and yet Defendants "downplay[ed] the key role of fossil fuels in climate change," *id.* ¶ 90, and "disseminate[d] deceptive information . . . to maintain their profits from fossil fuel sales," *id.* ¶ 67.

17.     The Attorney General purports to disavow "relief that would force Defendants to discontinue, reduce, or eliminate their extraction or production of fossil fuels, or eliminate the sale of Defendants' fossil fuel products to Vermont consumers or impose limits on the quantities sold here." Compl. ¶ 6. But that self-serving assertion is belied by the very claims in the Attorney General's Complaint. The first purported cause of action specifically asserts that Defendants' alleged misrepresentations or omissions caused harm because "the use of Defendants' fossil fuel products will contribute to global warming, sea level rise, disruptions to the hydrologic cycle, increased extreme precipitation, heatwaves, drought, and other consequences of the climate crisis." *Id.* ¶ 179. The Attorney General seeks to "disgorge all funds acquired and/or retained" as a result

of the alleged conduct, thus functionally penalizing Defendants' sales of fossil fuel products that were used and combusted, releasing greenhouse gas emissions. *Id.* at 68 (prayer for relief); *see id.* ¶ 1(d) ("The main human influence on the climate is via ***combustion of fossil fuels***[.]").  And the Attorney General's requested injunctive relief asks for an order requiring the "disclosure of the role of fossil fuels in climate change at every point of sale in the State of Vermont" precisely because it would, as alleged, force a reduction in fossil fuel sales. *Id.* at 68.  Thus, the goal of the Attorney General's action is to suppress fossil fuel sales (and thereby abate greenhouse gas emissions) by imposing liability on Defendants for failing to shift consumer demand at the point of sale.

18.     Moreover, central to the Attorney General's claims is the notion that Defendants produced, promoted, and sold oil and gas products to billions of consumers around the world, and thus have had a global impact. *See, e.g.*, Compl. ¶ 2 (alleging Defendants "have long known that the harm to the climate that has already occurred, and the further harm still to come, would be virtually inevitable so long as they could market their fossil fuel products to consumers in Vermont *and elsewhere* without honestly informing those consumers about the climate impacts of the products." (emphasis added)); *id.* ¶ 50 (complaining about "the impact of fossil fuel products on the environment, including *global* warming and its consequences") (emphasis added); *id.* ¶ 1 (alleging the "***combustion of fossil fuels***" contributes to "[h]uman-induced climate change . . . *in every region across the globe*") (emphases added).

19.     Indeed, the Attorney General's claims implicate Defendants' nationwide and global activities, as well as the activities of billions of fossil fuel consumers, including not only the U.S. government and military and other national governments and their military complexes around the world, but also heavy industries—like steel, cement, aviation, shipping, road transport—and basic

11

infrastructure—like hospitals, schools, manufacturing facilities, and individual households. The production of a dependable, affordable energy supply by Defendants and other oil and gas producers and distributors is the backbone of not just the American economy, but that of the world. Fossil fuel products power our national defense and military; drive production and innovation; keep our homes, offices, hospitals, and other essential facilities illuminated, powered, heated, and ventilated; transport workers and tourists across the nation; and form the materials from which innumerable consumer, technological, and medical devices are fashioned.

20.     Because the Complaint seeks to hold Defendants liable for the alleged harms caused by fossil fuel combustion, the Complaint necessarily also seeks to hold Defendants liable for longstanding decisions by the federal government regarding, among other things, national security, national energy policy, environmental protection, the maintenance of a national strategic petroleum reserve program, development of the nation's resources on the Outer Continental Shelf, mineral extraction on federal lands (which have yielded billions of dollars for the federal government), and the negotiation of international agreements bearing on the issue of climate change. Defendants have leases and contracts with the federal government to develop and extract minerals from federal lands, and have acted under the direction of federal officers to produce and sell fuel and associated products to the federal government for the nation's defense.

21.     The Complaint improperly attempts to apply state law to interstate and, indeed, international activity to which federal law and only federal law applies. The policy decisions surrounding the use of fossil fuels and the threat of climate change "require consideration of competing social, political, and economic forces," as well as "economic [and] defense considerations." *Juliana* v. *United States*, 947 F.3d 1159, 1172 (9th Cir. 2020) (internal quotation marks and citations omitted). In *City of New York II*, the Second Circuit held that allowing a suit

like this one challenging the production, promotion, and sale of fossil fuels "to proceed under state law would further risk upsetting the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." 993 F.3d at 93. This lawsuit therefore implicates bedrock divisions of federal-state responsibility, and the Attorney General's claims fall squarely on the federal side.

22.     The Attorney General's claims, if any, "must be brought under federal common law." *Id.* at 95. The domestic aspects of this case are governed by the Clean Air Act and Environmental Protection Agency ("EPA") regulations, while the international aspects of the case are governed by the Foreign Commerce Clause and the foreign affairs powers of the federal government. The promotion and sale of fossil fuels is lawful throughout the world, and many countries encourage the production of oil and gas within their borders—often going to great lengths to do so. As the United States has noted in a brief filed in a similar climate change action: "Where, as here, [plaintiffs] seek to project state law into the jurisdiction of other nations, the potential is particularly great . . . for interference with United States foreign policy." Br. of the United States as Amicus Curiae, *City of Oakland* v. *BP p.l.c.*, 960 F.3d 570 (9th Cir. 2020) (No. 18-16663), 2019 WL 2250196, at *15.

23.     Accordingly, the Complaint intrudes on the federal government's exclusive prerogative to address important issues of national and international energy policy. Striking the proper balance between promoting fossil fuels and reducing greenhouse gas emissions is an interstate and international issue, and the Attorney General's claims directly implicating this issue can be addressed only on a national level. The Complaint should be heard in a federal forum.

## GROUNDS FOR REMOVAL

24.     A defendant may remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). Regardless of the Attorney General's characterization of his claims, this Court has original jurisdiction on multiple grounds.[8]

25.     The Attorney General's claims in this action—like those rejected in *City of New York II*—represent a blatant effort to impermissibly regulate Defendants' fossil fuel promotion and sales through the guise of state consumer protection law. Accordingly, this action is removable on multiple independent grounds.

26.     ***First***, the Attorney General's claims, if any, necessarily concern transboundary pollution and foreign affairs and raise significant federalism concerns, and therefore "must be brought under federal common law." *City of New York II*, 993 F.3d at 95. Although the City has framed its Complaint with reference to state law, this Court is not bound by that characterization where, as here, the Attorney General's focus on the promotion and sale of fossil fuels "is merely artful pleading and does not change the substance of its claims." *Id.* at 97. Even if federal common law does not provide a direct basis for removal under the artful pleading doctrine and well-pleaded complaint rule, *Grable & Sons Metal Prod., Inc.* v. *Darue Eng'g & Mfg*, 545 U.S. 308, 312 (2005) provides a separate and independent basis for federal jurisdiction because this action raises

---

[8]     Removal jurisdiction under 28 U.S.C. § 1441(a) is coextensive with original jurisdiction under 28 U.S.C. § 1331. *See Wis. Dep't. of Corr.* v. *Schacht*, 524 U.S. 381, 390 (1998) ("Since a federal court would have original jurisdiction to hear this case had [the plaintiff] originally filed it there, the defendants may remove the case from state to federal courts." (citing 28 U.S.C. § 1441(a))); *see also* 14C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3722 (Rev. 4th ed. Apr. 2020) ("Generally, then, removal based on Section 1441(a) embraces the same class of cases as is covered by Section 1331, the original federal-question jurisdiction statute.").

substantial and disputed federal questions concerning the federal common law of transboundary pollution and foreign affairs.

27.     ***Second***, even considering the Attorney General's nominally state-law claims under the Vermont Consumer Fraud Act, this action is removable pursuant to *Grable* because the Complaint necessarily raises several substantial and disputed federal questions concerning federal environmental standards, regulations, and international treaties striking a balance between the use of fossil fuels and the reduction of greenhouse gas emissions.

28.     ***Third***, this action meets the elements of the federal officer removal statute, 28 U.S.C. § 1442, because the Attorney General's claims are "connected or associated" with fossil fuel production activities that Defendants have undertaken at federal direction for decades.

29.     ***Fourth***, this action is removable under the Outer Continental Shelf Lands Act ("OCSLA") because this case arises out of, or in connection with, operations Defendants conducted on the Outer Continental Shelf.

30.     ***Fifth***, the Attorney General's claims arise out of Defendants' substantial fossil fuel production activities on federal enclaves, warranting the exercise of federal enclave jurisdiction.

31.     ***Sixth***, the Attorney General brings this suit on behalf of Vermont consumers, who are the real parties in interest, permitting removal on the basis of diversity of citizenship under 28 U.S.C. § 1332(a).[9]

## I.     The Attorney General's Claims Are Governed by Federal Common Law and Therefore Are Subject to Removal.

32.     This Court has jurisdiction over this action because federal common law governs the Attorney General's claims.  The Attorney General's claims arise under federal common law

---

[9]     If the Attorney General challenges this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds beyond their specific articulations in this Notice.  *See Betzner* v. *Boeing Co.*, 910 F.3d 1010, 1014–16 (7th Cir. 2018).

because federal law exclusively governs claims for interstate and international pollution, as well as claims implicating the foreign affairs of the United States. This Court's jurisdiction is therefore warranted under federal common law through the artful pleading doctrine, *Grable* and its progeny, or both.

## A.    The Attorney General's Claims Necessarily Arise Under Federal Common Law.

33.    Under the Second Circuit's decision in *City of New York II*, the Attorney General's claims here must arise, if at all, under federal common law. Accordingly, "those federal claims," *City of New York II*, 993 F.3d at 95, are subject to federal question jurisdiction, *see, e.g.*, *Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians*, 471 U.S. 845, 850 (1985); *Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997).

34.    Although "there is no federal *general* common law," *City of New York II*, 993 F.3d at 89 (quoting *Erie R.R. Co.* v. *Tompkins*, 304 U.S. 64, 78 (1938)), there remain "some limited areas" in which the governing legal rules are supplied not by state law, but by "what has come to be known as 'federal common law,'" *Tex. Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *United States* v. *Standard Oil Co. of Cal.*, 332 U.S. 301, 308 (1947). In particular, federal common law governs areas implicating "uniquely federal interests," *City of New York II*, 993 F.3d at 90, such as where the issue is, by nature, "within national legislative power" and there is a "demonstrated need for a federal rule of decision" on that issue, *Am. Elec. Power Co.* v. *Connecticut*, 564 U.S. 410, 421–22 (2011) ("*AEP*") (citation omitted). Such uniquely federal interests are also present where "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 641. As the Supreme Court has repeatedly recognized, "if federal common law exists, it is because state law cannot be

used." *City of Milwaukee* v. *Illinois* ("*Milwaukee II*"), 451 U.S. 304, 313 n.7 (1981); *see Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 508 (1988).

35.     Here, as in *City of New York II*, the Plaintiff's claims necessarily arise under federal common law because they implicate two "uniquely federal interests": transboundary pollution and foreign affairs. 993 F.3d at 90.

### 1.     *The Attorney General's Claims Implicate Transboundary Pollution.*

36.     "Environmental protection is undoubtedly an area 'within national legislative power'" for which federal courts may "fashion" federal common law. *AEP*, 564 U.S. at 421 (citation omitted); *see also Illinois* v. *City of Milwaukee* (*"Milwaukee I"*), 406 U.S. 91, 103 (1972) ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law."). Thus, federal common law is to be applied to "transboundary pollution suits." *Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012); *see, e.g.*, *Int'l Paper Co.* v. *Ouellette*, 479 U.S. 481, 487–88 (1987).

37.     *City of New York* demonstrates this principle in action.  In that case, the City of New York sued several energy companies—including two of the Defendants here[10]—for their "worldwide fossil fuel production and the use of their fossil fuel products, [which] continue[] to emit greenhouse gases and exacerbate global warming." *City of New York* v. *BP P.L.C.*, 325 F. Supp. 3d 466, 471 (S.D.N.Y. 2018) ("*City of New York I*"), *aff'd sub nom*, 993 F.3d 81, 91 (2d Cir. 2021) (internal quotation marks omitted).

38.     The City asserted causes of action for public nuisance, private nuisance, and trespass under New York law stemming from defendants' "production, ***promotion***, and sale of

---

[10]    The defendants in *City of New York* were Chevron Corporation, ConocoPhillips, Exxon Mobil Corporation, Royal Dutch Shell plc, and BP p.l.c.

fossil fuels." 993 F.3d at 88 (emphasis added). Specifically, the City argued that defendants' production, marketing, promotion, distribution, and sale of fossil fuels "downplay the threat posed by climate change" which "will cause increasingly severe injuries to New York City." 325 F. Supp. 3d at 470. There, as here, the plaintiff attacked defendants' promotion and marketing of fossil fuels.

39.     The U.S. District Court for the Southern District of New York dismissed the City's complaint "with prejudice in its entirety," holding that the city's climate change-based claims were necessarily governed by federal common law, not state law, because "a federal rule of decision is 'necessary to protect uniquely federal interests.'" *City of New York I*, 325 F. Supp. 3d at 471, 476 (quoting *Tex. Indus.*, 451 U.S. at 640). The City argued that its purported state law claims were not governed by federal common law because the City merely challenged "the production, promotion, and sale of fossil fuels" but did not seek to regulate emissions. *City of New York II*, 993 F.3d at 91. The district court disagreed: "regardless of the manner in which the City frames its claims . . . , the amended complaint makes clear that the City is seeking damages for global-warming related injuries resulting from greenhouse gas emissions, and not only the production of Defendants' fossil fuels." *City of New York I*, 325 F. Supp. 3d at 471–72. Because the City's claims were "ultimately based on the 'transboundary' emission of greenhouse gases," the court concluded they "arise under federal common law and require a uniform standard of decision." *Id.* at 472.

40.     The Second Circuit affirmed in a unanimous panel decision, holding that federal common law, not state law, governs claims seeking redress for global climate change, a "uniquely international problem of national concern" that is "not well-suited to the application of state law." *City of New York II*, 993 F.3d at 85–86. That court rejected the City's effort to characterize its

18

action as challenging only defendants' "production, promotion, and sale of fossil fuels," not the "regulation of emissions":

> Though the City admits (as it must) that greenhouse gas emissions play a role in the case, the City insists that such emissions are only a link in "the causal chain" of the City's damages. So, because it is not seeking to directly penalize emitters, and because it seeks damages rather than abatement, the City argues that its claims will not result in the regulation of global emissions. In other words, we are told that this is merely a local spat about the City's eroding shoreline, which will have no appreciable effect on national energy or environmental policy. We disagree.

> Artful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions. It is precisely *because* fossil fuels emit greenhouse gases – which collectively "exacerbate global warming" – that the City is seeking damages. Put differently, the City's complaint whipsaws between disavowing any intent to address emissions and identifying such emissions as the singular source of the City's harm. But the City cannot have it both ways.

*Id.* at 88, 91(internal citations omitted).

41.     The "goal" of the City's action, the court summarized, is "to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *Id.* at 93. But "[s]uch a sprawling case is simply beyond the limits of state law." *Id.* at 92. The application of federal common law was necessary, the Second Circuit explained, because the City "would effectively regulate the Producers' behavior far beyond New York's borders." *Id.* The City sought to impose massive liability on defendants to limit—if not cease—their global production and promotion of fossil fuels. The City's claims therefore "pose[] the quintessential example of when federal common law is most needed." *Id.*

42.     *City of New York* follows a "mostly unbroken string of cases" that have "applied federal law to disputes involving interstate air or water pollution." 993 F.3d at 91. As the Second Circuit explained, the Supreme Court has done so because those disputes "often implicate two federal interests that are incompatible with the application of state law": the "overriding . . . need

for a uniform rule of decision" on matters influencing national energy and environmental policy, and "basic interests of federalism." *Id.* at 91–92 (citation omitted).

43.    In *Milwaukee I*, a unanimous Supreme Court held that a suit for interstate water pollution arose under federal law and was within the jurisdiction of the federal district courts. 406 U.S. at 108.  In that case, the State of Illinois filed a motion for leave to pursue an original action in the Supreme Court. *Id.* at 94.  The proposed action sought to abate a nuisance allegedly created by Milwaukee and its sewerage authorities by their discharges of inadequately treated sewerage into Lake Michigan. *Id.* at 93.  The Court denied the motion to invoke its original jurisdiction, but held that Illinois could seek relief in federal district court under the federal common law of nuisance. *See id.* at 107–08.  The Court characterized the issue before it as whether "pollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. §] 1331(a)." *Id.* at 99.  It ruled in the affirmative, giving "laws" its "natural meaning" and holding that an action based on federal common law, as much as an action based on a federal statute, supports federal question jurisdiction. *Id.* at 99–100.  The Court was explicit: "federal common law . . . is [an] ample basis for federal jurisdiction under 28 U.S.C. [§] 1331(a)." *Id.* at 102 n.3.

44.    The Supreme Court subsequently reaffirmed the jurisdictional holding of *Milwaukee I* in *AEP*.  In that case, plaintiffs sued several electric utilities, contending that the utilities' greenhouse gas emissions contributed to global climate change and created a "substantial and unreasonable interference with public rights, in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law." 564 U.S. at 418 (internal quotation marks and citation omitted).  In determining whether plaintiffs had properly stated a claim for relief, the Court determined that federal common law governs claims involving "air and water in

their ambient or interstate aspects." *Id.* at 421. The Court rejected the notion that state law could govern public nuisance claims related to global climate change, reasoning that "borrowing the law of a particular State would be inappropriate." *Id.* at 422.

45.     With this lawsuit, the Attorney General targets one step further up the supply chain from *AEP*—companies that provide energy to generate electricity. Here, the Attorney General has brought a transboundary pollution suit that aims to "effectively regulate" Defendants' behavior "far beyond" Vermont's borders. *City of New York II*, 993 F.3d at 92. The Complaint implicates interstate pollution and renders the application of federal common law necessary. The goal of the Attorney General's action is to suppress fossil fuel sales and thereby curb greenhouse gas emissions by imposing liability on Defendants for failing to shift consumer demand from fossil fuels to alternative sources of energy. The Attorney General alleges that Defendants are liable for their continued promotion, marketing, and sale of fossil fuels "precisely *because* [these] fossil fuels emit greenhouse gases," and are alleged to "collectively '*exacerbate global warming.*'" *Id.* at 91 (second emphasis added). Indeed, like the City of New York, the Attorney General expressly alleges that Defendants' "production, distribution, and sale of fossil fuel products . . . *exacerbate climate change.*" Compl. ¶ 120 (emphasis added).

46.     The Attorney General endeavors to trace Defendants' advertisements to the climate impacts it seeks to curb through this action.[11] The Complaint alleges that Defendants' advertising allegedly influences consumers' "decisions regarding the purchase of Defendants' fossil fuel

---

[11]    The Complaint is not limited to challenging allegedly misleading statements in Defendants' advertisements. In alleging Defendants' "omissions . . . were intentionally designed to mislead such consumers and influence their decisions regarding the purchase of Defendants' fossil fuel products," the Complaint makes clear that it seeks to impose liability on Defendants merely for the sale or offering for sale of fossil fuel products, regardless of whether those sales were accompanied by any false or misleading statement. Compl. ¶ 95.

products." Compl. ¶ 95.  It also alleges that consumers' use of those products along with "the development, production, [and] refining" of those products "*increases* greenhouse gas emissions and is a leading cause of global warming." *Id.* ¶ 118.[12]  The Complaint then connects global warming to the adverse consequences it wishes to curb, including "rising sea levels, disruptions to the hydrologic cycle, increases in extreme precipitation, heatwaves, and droughts." *Id.* ¶ 168.  And in its prayer for relief, the Complaint seeks "to disgorge all funds acquired and/or retained" as a result of the alleged deception and to compel Defendants to post disclaimers describing "the role of fossil fuels in climate change at every point of sale in the State of Vermont." *Id.* at 68.  By requesting disgorgement of profits, the Complaint functionally seeks to impose strict liability for greenhouse gas emissions and purported climate injuries.  And by requesting disclaimers on every fuel pump or product label, the Attorney General makes clear that its goal for this litigation is to regulate the sale of fossil fuel and thereby curb greenhouse gas emissions.

47.    The Complaint alleges that Defendants' "deception" is actionable *because* it is "likely to affect Vermont consumers' decisions with regard to the purchase or use [of] Defendants' fossil fuel products," and enables the "continued use of these products," which "will cause catastrophic effects on the environment if unabated." *Id.* ¶ 182; *see also id.* ¶ 2 (alleging that Defendants' deception was "material[]" because "Vermont consumers would choose to buy and consume lower quantities of their fossil fuel products, or perhaps stop buying them altogether"); *id.* ¶ 67 (alleging Defendants "prevent[ed] consumers from making purchasing decisions based on accurate knowledge of the climate impacts of Defendants' fossil fuels" all "with the aim of . . .

---

[12]  *See also id.* ¶ 55 (alleging Defendants' fossil fuel products have had a "grave impact . . . on the climate"); *id.* ¶ 64 ("the fossil fuels sold by . . . Defendants were significantly contributing to climate change"); *id.* ¶ 69 ("the connection between Defendants' fossil fuel products and climate change" is a "key attribute of those products").

continuing, unabated use of their products"). Moreover, the Attorney General alleges that Defendants have somehow impeded "the transition to a stable energy system" by "cho[osing] to hide important information about their products from consumers in Vermont and elsewhere." *Id.* ¶ 58. The Attorney General further alleges that "the use of [Defendants'] fossil fuel products . . . is and remains a leading cause of global warming and, unless abated, will bring about grave consequences." *Id.* ¶ 98; *see also* ¶ 118 (same).

48.     In other words, it "is precisely *because* fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'" that the Attorney General seeks to hold Defendants liable here. *City of New York II*, 993 F.3d at 91. The Attorney General has brought this action because Defendants' "core businesses" allegedly "remain focused upon expanding the production, distribution, and sale of fossil fuel products that exacerbate climate change." Compl. ¶ 120. The Attorney General's true grievance is the alleged "ultimate impact of [Defendants'] products on the climate." *Id.* ¶ 52. Thus, the Attorney General's ultimate goal is to force Defendants to stop or substantially curtail fossil fuel extraction, production, and sales to lower greenhouse gas emissions.

49.     These allegations demonstrate that the core issue raised in the Complaint is not the accuracy of representations made in advertisements about Defendants' products, but rather whether Defendants should continue to extract, produce, and sell fossil fuel products. *See, e.g.*, Compl. ¶ 125–126 ("Exxon remains laser-focused on increasing the production, distribution, and use of fossil fuel products, and its 'investments' in alternative energy sources are relatively miniscule and inconsequential in comparison. Contrary to the impression created by its greenwashing, Exxon has continued to ramp up fossil fuel production, and to plan for unabated oil and gas exploitation indefinitely into the future."); *id.* ¶ 156 ("Sunoco . . . remains focused on

selling fossil fuels while it seeks to draw consumers' attention away from the significant role it continues to have in contributing to climate change.").

50.     This lawsuit thus directly implicates the transboundary pollution of fossil fuel activities and "must be brought under federal common law." *City of New York II*, 993 F.3d at 95.

### 2.     *The Attorney General's Claims Implicate Foreign Affairs.*

51.     The international nature and impacts of the Attorney General's claims are another reason why this suit arises only under federal common law.

52.     It is well settled that actions involving foreign affairs arise under federal common law. *See, e.g.*, *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 425 (1964) (holding that issues involving "our relationships with other members of the international community must be treated exclusively as an aspect of federal law"); *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 381, 388 (2000) (striking down a Massachusetts law barring state entities from transacting with companies doing business in Myanmar because the law "undermine[d] the President's capacity . . . for effective diplomacy"). The Supreme Court has made clear that claims that significantly implicate the "exercise of state power that touches on foreign relations must yield to the National Government's policy." *Am. Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 413 (2003). This includes matters of state law. *See Zschernig* v. *Miller*, 389 U.S. 429, 432 (1968) (holding that a state probate statute constituted "an intrusion by the State into the field of foreign affairs" and was governed by federal common law).

53.     The Second Circuit, too, has explained that "there is federal question jurisdiction over actions having important foreign policy implications." *Republic of Philippines* v. *Marcos*, 806 F.2d 344, 353 (2d Cir. 1986); *see also In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 118 (2d Cir. 2010) (reasoning that state laws that prevent the President from "wield[ing] the full coercive power of the national economy as a tool of diplomacy in negotiating a process for settling

claims . . . compromise[] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." (internal quotation marks and citation omitted)).

54.      Indeed, actions like this one, which "implicat[e] . . . our relations with foreign nations," are "the quintessential example of when federal common law is most needed." *City of New York II*, 993 F.3d at 92.

55.      The Attorney General's lawsuit is a transparent attempt to force Defendants to reduce—if not eliminate—their fossil fuel production activities to achieve the State of Vermont's preferred greenhouse gas emissions levels and transition to other forms of energy. *See supra* ¶¶ 45–49. By its very nature, this action implicates activities of not just these Defendants, but also the rest of the world, outside the borders of Vermont. The Complaint thus "effectively" seeks to require Defendants to take action "across every state (and country)" all "without asking what the laws of those other states (or countries) require." *City of New York II*, 993 F.3d at 92.

56.      The upshot of this purported extraterritorial regulation is that the Attorney General's claims necessarily will interfere with a carefully calibrated network of "international treaties" that strike a "balance . . . between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *City of New York II*, 993 F.3d at 93.

57.      That complex web of agreements has a long history and Defendants describe only some examples below, demonstrating how the federal government has balanced evolving national and international policy goals.

58.      In 1959, President Eisenhower invoked statutory authority to proclaim quotas on imports of petroleum and petroleum-based products into the United States "to avoid

discouragement of and decrease in domestic oil production, exploration and development to the detriment of the national security." Adjusting Imports of Petroleum and Petroleum Products into the United States, Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 10, 1959); *see* Act of July 1, 1954, 68 Stat. 360, ch. 445, § 2, as amended by Pub. L. No. 85-686, 72 Stat. 678, § 8(a) (Aug. 20, 1958).

59.     The import system was "mandatory" and "necessary" to "preserve to the greatest extent possible a vigorous, healthy petroleum industry in the United States and to regulate 'patterns of international trade.'" Statement by the President Upon Signing Proclamation Governing Petroleum Products, 1 Pub. Papers 240–41 (Mar. 10, 1959). President Eisenhower further explained the United States' foreign and domestic policy: "Petroleum, wherever it may be produced in the free world, is important to security, not only of ourselves, but also of the free people of the world everywhere." *Id.*

60.     After the 1973 oil embargo, the United States signed a treaty that requires member countries of the International Energy Agency to hold emergency oil stocks—through government stocks or industry-obligated stocks—equivalent to at least 90 days of net oil imports. *See* Agreement on an International Energy Program art. 2, *concluded* Nov. 18, 1974, 1040 U.N.T.S. 271. The United States meets part of its obligation through government-owned stocks held in the U.S. Strategic Petroleum Reserve. *See, e.g.*, 42 U.S.C. § 6231(b); Nat'l Energy Policy Dev. Grp., National Energy Policy, 8–17 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf.

61.     In the 1990s, in response to President Clinton's signing of the Kyoto Protocol, an international commitment to reduce greenhouse gas emissions, the Senate resolved that the nation should not be a signatory to any protocol that "would result in serious harm to the economy" or fail to regulate the emissions of developing nations. S. Res. 98, 105th Cong., 1st Sess. (1997).

62.     Subsequently, President Obama promoted shale oil and natural gas development as a means to reduce greenhouse gas emissions and to encourage "greater energy independence." Barack Obama, U.S. President, Presidential Debate in Hempstead, New York (Oct. 16, 2012), *in Public Papers of the Presidents of the United States, Administration of Barack Obama, 2012*, at 1534 (2017).[13]   During President Obama's presidency, domestic gas production increased 35 percent, and domestic crude oil production increased 80 percent. *Id.*  President Obama also issued a series of directives in May 2011, "which included additional lease sales, certain offshore lease extensions, and steps to streamline permitting, all towards the President's goal of expanding safe and responsible domestic oil and gas production . . . as part of his long-term plan to reduce our reliance on foreign oil."  Press Release, Office of the Press Sec'y, *Obama Administration Holds Major Gulf of Mexico Oil and Gas Lease Sale* (Dec. 13, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/12/13/obama-administration-holds-major-gulf-mexico-oil-and-gas-lease-sale.

63.     In 2016, the United States under President Obama joined the Paris Agreement under the United Nations Framework Convention on Climate Change. *See* Paris Agreement Under the United Nations Framework Convention on Climate Change, *entered into force* Nov. 4, 2016, T.I.A.S. No. 16-1104.  The Agreement calls upon signatories to reduce greenhouse gas emissions by determining, planning, and regularly reporting on the contributions that they undertake to mitigate climate change.  Joining the Paris Agreement, President Obama proclaimed, would "help other nations ratchet down their dangerous carbon emissions over time, and set bolder targets as technology advances, all under a strong system of transparency that allows each nation to evaluate

---

[13]   *See also* Jude Clemente, *President Obama's Support for America's Shale Oil and Natural Gas*, Forbes (Dec. 31, 2019), https://www.forbes.com/sites/judeclemente/2020/12/31/president-obamas-support-for-americas-shale-oil-and-natural-gas/#4bd1e46b1883.

the progress of all other nations." Press Release, Office of the Press Sec'y. *Remarks by the President on the Paris Agreement* (Oct. 5, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/10/05/remarks-president-paris-agreement.

64.     President Trump subsequently cited foreign affairs implications in his decision to withdraw from the Paris Agreement, a decision based, in large part, on his administration's conclusion that the treaty did not strike the right balance between environmental protection, on the one hand, and economic growth and national security, on the other. *See* Press Release Office of the Press Sec'y, *Statement by President Trump on the Paris Climate Accord* (June 1, 2017), https://it.usembassy.gov/statement-president-trump-paris-climate-accord/.

65.     The United States reversed course when President Biden rejoined the Paris Agreement on his very first day in office. *See* Depositary Notification, *Paris Agreement 12 December 2015 United States of America Acceptance*, No. C.N. 10.2021.Treaties-XXVII.7.d (Jan. 20, 2021).

66.     Subsequent presidential administrations may strike a different "balance" between the "prevention of global warming" on the one hand and "energy production, economic growth, foreign policy, and national security, on the other." *City of New York II*, 993 F.3d at 93. But under the Attorney General's view, it would be left to a Vermont state court, whether judge or jury, to strike that balance among competing national and international policy imperatives.

67.     This lawsuit conflicts with longstanding foreign policy of the United States. The United States has consistently opposed the "establishment of sovereign liability and compensation schemes" to address climate change on the international level. Br. of the United States as Amicus Curiae, *City of Oakland* v. *BP PLC*, No. 18-16663 (9th Cir. May 17, 2019) (citing U.S. Dep't of State, *Special Briefing, Special Envoy for Climate Change Todd D. Stern* (Oct. 28, 2015),

https://2009-2017.state.gov/s/ climate/releases/2015/248980.htm), Dkt. 97; *see also City of New York I*, 325 F. Supp. 3d at 475.

68.     In reaction to this and similar lawsuits, foreign governments might adopt their own "liability and compensation" schemes for past use of fossil fuels, contrary to the foreign policy of the United States.  Thus, this lawsuit infringes upon the foreign policy of the United States regarding the proper way to address the issue of climate change on the international stage.

69.     By asking a state court to weigh in on precisely those issues, this case would "implicate countless foreign governments and their laws and policies." *City of New York I*, 325 F. Supp. 3d at 475.

70.     Moreover, the Complaint alleges that Defendants' advertisements are deceptive because they tout Defendants' investments in clean energy "when in fact," the Complaint alleges, these investments "are relatively miniscule and inconsequential in comparison" to Defendants' production of fossil fuel products.  Compl. ¶ 125.  The Complaint functionally takes aim at Defendants' continued oil and gas production and asks the Court to decide whether Defendants' investments in alternative energy sources are, in fact, too small relative to Defendants' production of fossil fuel products.  Such a determination could result in relief that conflicts with the federal government's stance in global climate negotiations, in which the government projects what *it* believes is the right balance between fossil fuel and alternative energy sources, and seeks to garner global participation in striking *that* balance.

71.     The Attorney General's claims thus infringe upon the federal government's environmental, trade, and energy policies, which require the United States to speak with one voice in coordinating with other nations. *See United States* v. *Pink*, 315 U.S. 203, 233 (1942) ("Power

over external affairs is not shared by the States; it is vested in the national government exclusively.").

**B.**      **The Artful Pleading Doctrine Supports This Court's Jurisdiction.**

72.      Although the Attorney General purports to assert claims exclusively arising under state law, courts have long recognized that claims may arise under federal common law regardless of the label a plaintiff affixes to its claims. *See, e.g.*, *Standard Oil Co.*, 332 U.S. at 307 (holding that certain claims asserted under state law must be governed by federal common law because they involved "matters essentially of federal character"); *City of New York II*, 993 F.3d at 91 (holding that "[a]rtful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions"); *Marcos*, 806 F.2d at 352 (holding that plaintiff's state law claims arose under federal common law, and that federal question jurisdiction thus existed); *Nordlicht* v. *New York Tel. Co.*, 799 F.2d 859, 862 (2d Cir. 1986) (holding that the plaintiff's claims concerning interstate telecommunications "ar[o]se under federal common law," even though the complaint "purport[ed] to rely solely on state law"), *abrogated on other grounds by Marcus* v. *AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998).

73.      The Attorney General has artfully pleaded its claims here, by purposefully obfuscating the core federal nature of its claims to try to keep this case in state court. "The artful-pleading doctrine, [a] corollary to the well-pleaded complaint rule, prevents a plaintiff from avoiding removal 'by framing in terms of state law a complaint the real nature of [which] is federal, regardless of plaintiff's characterization.'" *Marcus*, 138 F.3d at 55 (quoting *Derrico* v. *Sheehan Emergency Hosp.*, 844 F.2d 22, 27 (2d Cir. 1988)).  As the Supreme Court explained in *Federated Department Stores, Inc.* v. *Moitie*, courts must "determine whether the real nature of the claim is federal, regardless of plaintiff's characterization." 452 U.S. 394, 397 n.2 (1981).

74.     Although the Attorney General has framed the Complaint with reference to state law, the artful pleading doctrine empowers this Court to evaluate the claims asserted and determine which body of law provides the rule of decision for those claims.  Here, it is federal common law that provides the rule of decision because the federal common law of **(i)** transboundary pollution, *see supra* ¶¶ 36–50, and **(ii)** foreign affairs, *see supra* ¶¶ 51–71, govern the Attorney General's claims.  As described above, this is clear from the face of the pleading.  *See, e.g.*, Compl. ¶ 118 (alleging that Defendants are liable because "the development, production, refining, and use of their fossil fuel products . . . *increases* greenhouse gas emissions" and alleging that Defendants are liable because their advertisements enable the "continued use of these products," which "will cause catastrophic effects on the environment if unabated"); *id.* ¶ 120 (alleging that Defendants are liable because their "core businesses" allegedly "remain focused upon expanding the production, distribution, and sale of fossil fuel products that exacerbate climate change").

75.     "Artful pleading cannot transform" the Attorney General's Complaint into "anything other than a suit over global greenhouse gas emissions." *City of New York II*, 993 F.3d at 91.  This is just the latest in a series of nearly two dozen climate-change-related lawsuits against groups of energy companies filed around the country that have increasingly strained to evade federal law.  *See supra* ¶¶ 8–9 nn.6–7.  The Attorney General may not use artful pleading to disguise this lawsuit as a "local issue," when in reality it amounts to a "clash over regulating worldwide greenhouse gas emissions and slowing global climate change." *City of New York II*, 993 F.3d at 91.

76.     The core nature of the Attorney General's claims is federal, and the artful pleading doctrine allows the exercise of federal jurisdiction notwithstanding the Attorney General's attempt to plead around it.

**C.      Jurisdiction Over Claims Governed by Federal Common Law Is Independently Authorized by *Grable*.**

77.     The *Grable* doctrine provides a separate and independently sufficient basis for jurisdiction under § 1331.  *See Grable*, 545 U.S. at 312.  Under the *Grable* doctrine, a lawsuit "arises under" federal law, warranting federal question jurisdiction, if a plaintiff's claims **(i)** "necessarily raise" stated federal issues **(ii)** that are "actually disputed" and **(iii)** "substantial," and **(iv)** that are "capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn* v. *Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314).  Where these requirements are met, federal jurisdiction is proper "because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum.'"  *Id.*  Determining whether federal jurisdiction is present "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue" and thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  *Grable*, 545 U.S. at 312–13 (internal quotation marks omitted).

78.     ***The Complaint necessarily raises federal issues that are actually disputed because Federal Common Law governs the claims***.  An action "necessarily raise[s]" federal issues, warranting the exercise of *Grable* jurisdiction, where it requires applying "principles of federal common law."  *Newton* v. *Cap. Assur. Co., Inc.*, 245 F.3d 1306, 1309 (11th Cir. 2001) (citing *Nat'l Farmers Union Ins. Cos.*, 471 U.S. 845 at 850).  Put differently, claims that implicate an area where "federal common law *alone* governs" necessarily raise a federal question.  *Battle* v. *Seibels Bruce Ins. Co.*, 288 F.3d 596, 607–08 (4th Cir. 2002).

79.     In both *Newton* and *Battle*, plaintiffs asserted claims relating to Standard Flood Insurance Policy ("SFIP") contracts.  *See* 245 F.3d at 1308; 288 F.3d at 607.  In both cases, plaintiffs purported to assert claims solely under state law.  But because SFIP contracts "are

interpreted using principles of federal common law rather than state contract law," *Newton,* 245 F.3d at 1309, each court held that "federal common law *alone* govern[ed]" plaintiffs' claims, regardless of how plaintiffs characterized them, *Battle,* 288 F.3d at 607. And because the plaintiffs' right to relief thus "necessarily depend[ed] on resolution of a substantial question of federal law," *Grable* jurisdiction was proper. *Id.*

80.     So, too, here. As described above, the Attorney General's claims are governed by federal common law because they directly implicate transboundary greenhouse-gas pollution and issues of foreign policy. *City of New York II*, 993 F.3d at 91; *see supra* § I(A)(1)–(2). The allegations asserted in the Complaint—coupled with the context in which the Attorney General brought this suit, *see* ¶¶ 3–12, *supra*—make clear that this action is not about how Defendants advertise their products, but whether their products should be sold at all. The Complaint is a vehicle for "maintaining pressure on the [fossil fuel] industry that could eventually lead to its support for legislative and regulatory responses to global warming." Ex. 4 at 27.

81.     Just like transboundary pollution claims, claims that implicate foreign policy and foreign affairs also "must be treated *exclusively* as an aspect of federal law," *Banco Nacional de Cuba,* 376 U.S. at 425 (emphasis added), and thus "necessarily depend[] on [the] resolution of a substantial question of federal law," *Battle,* 288 F.3d at 607–08. As described above, the Attorney General's claims implicate the United States' international climate-change policy, which has, for decades, carefully calibrated and balanced environmental policy with economic development. Because the Attorney General's claims implicate the "exercise of state power that touches on foreign relations," state law "must yield to the National Government's policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's

allocation of the foreign relations power to the National Government." *Garamendi*, 539 U.S. at 413 (internal quotation marks and citations omitted).

82.     Claims that are governed by federal common law "necessarily depend[] on [the] resolution of a substantial question of federal law," *Battle*, 288 F.3d at 607–08.  Accordingly, the claims necessarily raise disputed questions of federal law under *Grable*.

83.     ***The federal issues raised here are substantial***.  The Attorney General seeks to impose significant penalties on Defendants based on assertions that contradict established federal policies endorsed by the President and numerous federal agencies, and by various federal laws. This constitutes a "collateral attack" on the "[federal] regulatory scheme" and on the federal system as a whole, which satisfies *Grable*'s requirement that the disputed issues are "substantial." *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E.* v. *Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017).

84.     In addition, because the federal common law of transboundary pollution and of foreign affairs necessarily governs this action, it sits at the intersection of federal energy and environmental regulations, which implicates foreign policy and national security considerations. This action also implicates the proper constitutional relationship among the states and also between the states and the federal government.  The substantiality inquiry is satisfied where the federal issues in a case concern even *one* of these subjects. *See, e.g.*, *NASDAQ OMX Grp., Inc.* v. *UBS Sec., LLC*, 770 F.3d 1010, 1029 (2d Cir. 2014) (issues related to "fair and orderly market[s]"); *In re Nat'l Sec. Agency Telecomms. Recs. Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (issues relating to the state secrets privilege); *Grynberg Prod. Corp.* v. *British Gas, p.l.c.*, 817 F. Supp. 1338, 1356 (E.D. Tex. 1993) (issues relating to allocation of international mineral resources).

85.    *The federal-state balance supports the federal forum*.  The exercise of federal jurisdiction is fully consistent with the principles of federalism.  This action challenges the promotion of certain energy sources and emissions-reduction measures in nationwide advertising as inherently misleading and seeks to commandeer those statements to effect a nationwide reduction in fossil fuel production and sales. *See supra* ¶¶ 45–50.  Federal courts are the traditional and appropriate fora for such litigation regarding the intersection of national energy and environmental law, and foreign policy. *See Massachusetts* v. *EPA*, 549 U.S. 497, 519 (2007) (explaining that the "sovereign prerogatives" to force reductions in greenhouse gas emissions "are now lodged in the Federal Government").

86.    Because the Attorney General's claims implicate the "exercise of state power that touches on foreign relations," state law "must yield to the National Government's policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government." *Garamendi*, 539 U.S. 413 (internal quotation marks omitted).

## II.    This Action Is Removable Under *Grable* Because It Raises Other Contested Federal Issues.

87.    *The Complaint necessarily raises federal issues that are actually disputed*.  An action "necessarily raise[s]" federal issues, warranting the exercise of *Grable* jurisdiction, where the court must determine whether an entity has complied with federally prescribed duties, *see NASDAQ OMX Grp., Inc.*, 770 F.3d at 1029, or where the "interpretation of federal law [is] required," *District of Columbia* v. *Grp. Hospitalization & Med. Servs., Inc.*, 576 F. Supp. 2d 51, 55 (D.D.C. 2008).

88.    Even considering the Attorney General's nominally state-law claims under the Vermont Consumer Fraud Act, in attempting to plead those purported claims, the Complaint also

necessarily raises several federal questions concerning federal environmental standards, again making the case removable. Specifically, the Attorney General's Complaint invokes federal regulations including regulations enacted by the Environmental Protection Agency. For example:

- The Attorney General alleges that "Shell['s] claims" about its V-Power Nitro+ Premium fuel are deceptive for stating "the fuel 'is more efficient,' has 'lower emissions,' and contains seven times the cleaning agents required to meet federal standards." Compl. ¶ 108. The Attorney General alleges that "Shell's website also advertises that this gasoline surpasses the minimum requirements for gasoline detergent additives set by the Environmental Protection Agency and thus has earned the so-called 'Top-Tier' certification." *Id.*

- The Attorney General alleges that a Sunoco advertisement was deceptive in stating that "UltraTech is held out by Sunoco as meeting 'stringent TOP TIER™ standards and exceed[ing] EPA standards for vehicle emissions and engine durability.'" *Id.* ¶ 115.

- And the Attorney General alleges that CITGO conveyed a misleading impression when it asserted on its website that TriCLEAN has earned the "'stringent' 'TOP TIER' designation because it 'surpasses the existing standards set forth by the EPA.'" *Id.* ¶ 117. The Attorney General complains that the statement that the continuous use of TriCLEAN "will maximize fuel mileage 'while minimizing exhaust emissions'" is deceptive. *Id.*

89.     Thus, in attempting to plead its purported claims under the Vermont Consumer Fraud Act, the Attorney General expressly invokes federal standards, raising numerous questions of federal law. Specifically, in order to assess whether these alleged statements are misleading, a court will need to assess what the federal standards are and whether the products in question

comply with, and surpass, existing standards set forth by the EPA. Thus, the Attorney General raises a disputed question of compliance with federal standards. *See, e.g.*, *NASDAQ OMX Grp., Inc.*, 770 F.3d at 1029.

90.     In addition to its purported claims under the misrepresentation prong of the Consumer Fraud Act, the Attorney General expressly invokes those federal standards as an element of his purported claim under the unfair prong of the Vermont Consumer Fraud Act. The Attorney General alleges that Defendants' acts and practices are unfair because, in part, they "are contrary to other statutory, regulatory, and/or common law policies and prohibitions," including misrepresentations related to "environmental benefits and/or environmental products or services." *Id.* ¶ 190. But when claims, like the Attorney General's, require the court to "interpret[]" federal regulations, the Complaint "necessarily raise[s] a stated federal issue." *Grp. Hospitalization & Med. Servs., Inc.*, 576 F. Supp. 2d at 55–56 (citation omitted).

91.     Even if Plaintiff's claims were resolved under state law, the Court would need to determine what federal standards the Attorney General is invoking when it pleads a supposed violation of the "minimum requirements for gasoline detergent additives set by the Environmental Protection Agency," and alleges that Defendants misleadingly stated that their fuel meets the "stringent TOP TIER standards and exceeds EPA standards for vehicle emissions and engine durability" and "the existing standards set forth by the EPA." Compl. ¶¶ 108, 115, 117. The Court also would need to determine what federal fuel economy standards apply in this context. *Id.* ¶¶ 117, 131. The Court would also need to determine whether Defendants complied with a variety of federal regulations. For example, as described above, the Court would need to determine whether any of Defendants' gasoline formulations met the relevant federal standards that the Attorney General invokes before determining whether Defendants' statements were deceptive.

The Court also would need to determine whether any of Defendants' actions "are contrary to" the federal "statutory, regulatory, and/or common law policies and prohibitions," including alleged misrepresentations related to "environmental benefits and/or environmental products or services" that the Attorney General invokes in the Complaint. *Id.* ¶ 190.

92.     Moreover, the Attorney General's theory of liability would force a court to second-guess federal decision-making and policy regarding the propriety of developing and producing various energy sources such as natural gas, biofuels, and traditional fossil fuels in order to decide whether Defendants' promotion of these activities was misleading or "unfair." The Attorney General would have a state court judgment displace the policy decisions made by the two elected branches of the federal government. Under the "unfair" prong of the Attorney General's purported claim under the Consumer Fraud Act, the state court would decide whether "[b]usiness conduct . . . offends public policy; or is immoral, unethical, oppressive, or unscrupulous; or causes substantial injury to consumers." Compl. ¶ 188. The Attorney General's claim thus would give broad warrant to a state court to penalize a business practice despite the considered judgments of elected federal officials.

93.     For example, the Complaint alleges that Defendants' promotion of natural gas as "clean energy" is deceptive, because natural gas "produces significant amounts of greenhouse gas emissions" and therefore "is not clean energy." Compl. ¶ 123; *see also id.* ¶¶ 140, 166. This view conflicts with official federal policy, which has, for many years, supported investment in and development of natural gas as a means of reducing greenhouse gas emissions and encouraging "greater energy independence." Barack Obama, *supra* ¶ 62. Recently, the EPA recognized that the switch from coal to natural gas for power generation played an important role in reducing

greenhouse gas emissions.[14]  Defendants' public statements that natural gas is a *relatively* cleaner burning fuel thus align with the energy policy endorsed by the federal government.

94.     Similarly, the Complaint alleges that Defendants' statements regarding biofuels and carbon capture are deceptive because they "falsely portray" Defendants as "making significant contributions to combatting climate change, when in fact . . . [their] 'investments' in alternative energy sources are relatively miniscule and inconsequential."  Compl. ¶ 125; *see also, e.g., id.* ¶¶ 130, 146, 157, 163.  Yet numerous federal policies endorse Defendants' public statements regarding biofuels and carbon capture.  For example, in 2019, ExxonMobil signed a $100 million agreement with Department of Energy laboratories to "explore ways to bring biofuels and carbon capture and storage to commercial scale across the power generation, transportation, and manufacturing sectors."[15]  ExxonMobil's public statements on biofuels are therefore the subject of a public–private partnership, and are under consideration by government agencies.  *Id.* Moreover, the White House recently issued a report outlining how carbon capture will play "an important role in decarbonization efforts globally" and "in meeting climate goals, domestically and globally."[16]  Defendants' stance on carbon capture therefore aligns with that of the federal government, and the Attorney General's claims would force a court to second-guess these federal policies to determine that Defendants' statements are deceptive.

---

[14]  *See* EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks (1990-2019)*, 2-1, 2-13 (Apr. 14, 2021), https://www.epa.gov/sites/default/files/2021-04/documents/us-ghg-inventory-2021-main-text.pdf?VersionId=wEy8wQuGrWS8Ef_hSLXHy1kYwKs4.ZaU.

[15]  Press Release, U.S. Dep't of Energy, *DOE National Labs Partner with ExxonMobil for $100 Million in Joint Research* (May 8, 2019), https://www.energy.gov/articles/doe-national-labs-partner-exxonmobil-100-million-joint-research.

[16]  Council on Envtl. Quality, *Rep. to Congress on Carbon Capture, Utilization, and Sequestration* 6, 11 (2021), https://www.whitehouse.gov/wp-content/uploads/2021/06/CEQ-CCUS-Permitting-Report.pdf.

95.     Additionally, this action demands that a state court pass judgment on the accuracy and "fairness" of statements about the merits of fossil fuels and what role, if any, they might play in meeting energy demand as society transitions toward lower emissions.  For instance, the Attorney General contends that Defendants deceived consumers whenever they described their efforts to "decrease [their] overall carbon footprint," Compl. ¶ 122, so long as Defendants continue to "ramp up fossil fuel production" or invest in new fossil fuel developments, *id.* ¶ 126. Adjudicating such claims requires resolving a fundamental question of climate policy:  whether the only way to reduce emissions is to reduce the production and sale of fossil fuels—which today still provide the majority of energy in the United States.

96.     ***The federal issues raised here are substantial.***  The Attorney General's purported state law claims require a court to interpret federal standards and duties, and such disputes "over [the] 'meaning of a federal [] provision' [are] '*important* federal-law issue[s] that belong[] in federal court.'"  *NASDAQ OMX Grp., Inc.*, 770 F.3d at 1024 n.9 (emphasis added) (quoting *Grable*, 545 U.S. at 309).  The action also seeks to impose liability on Defendants based on assertions that contradict established federal policies, constituting a "collateral attack" on the federal regulatory scheme and on the federal system as a whole, thus satisfying the substantiality requirement.  *See Tenn. Gas Pipeline Co.*, 850 F.3d at 724.

97.     ***The federal–state balance supports the federal forum.***  The exercise of federal jurisdiction is fully consistent with the principles of federalism.  This action, which seeks to impose significant penalties on Defendants, hinges on the interpretation of various federal regulations and policies.  The Attorney General's "efforts to have" these federal regulations and policies "assessed by reference to state law principles . . . could undermine Congress's expectations for uniformity"

in their interpretation. *NASDAQ OMX Grp., Inc.*, 770 F.3d at 1031. A federal court is the appropriate forum for such litigation.

**III.     This Action Is Removable Under the Federal Officer Removal Statute.**

98.     The federal officer removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "To invoke the statute, a defendant who is not himself a federal officer must demonstrate that (1) the defendant is a 'person' under the statute, (2) the defendant acted 'under color of federal office,' and (3) the defendant has a 'colorable federal defense.'" *Agyin* v. *Razmzan*, 986 F.3d 168, 174 (2d Cir. 2021). So long as federal officer jurisdiction is necessary as to one defendant, jurisdiction over the entire action is permissible. *See* 28 U.S.C. § 1367. Defendants satisfy these criteria here.

**A.     Courts Construe the Federal Officer Removal Statute Broadly in Favor of Removal.**

99.     The federal officer removal statute is "liberally construed" in favor of a federal forum. *Watson* v. *Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *accord Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 136 (2d Cir. 2008). Courts have repeatedly held that "defendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute." *Leite* v. *Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014); *see also Gordon* v. *Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 316 (E.D.N.Y. 2014) (distinguishing federal officer removal from general removal statute). The Supreme Court has emphasized that the policy of providing the protection of a federal forum to federal officers "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham* v. *Morgan*, 395 U.S. 402, 407 (1969). Thus, courts must apply a "broad construction" of the statute—"particularly with respect to private parties who claim to be 'acting under' a federal officer." *Agyin*, 986 F.3d at 175.

100.    "Not only must the words of § 1442 be construed broadly but a court also 'must credit [the d]efendants' theory of the case' when evaluating the relationship between the defendants' actions and the federal officer." *Id.* at 175 (citing *Isaacson*, 517 F.3d at 137); *see also Jefferson County* v. *Acker*, 527 U.S. 423, 432 (1999) ("[W]e credit the [defendants'] theory of the case for purposes of [all] elements of our jurisdictional inquiry."); *accord Baker* v. *Atl. Ritchfield Co.*, 962 F.3d 937, 947 (7th Cir. 2020). At this stage, a defendant's allegations "in support of removal" need only be "facially plausible," and the defendant receives the "benefit of all reasonable inferences from the facts alleged." *Baker*, 962 F.3d at 941, 945. Defendants need not, at this juncture, affirmatively prove that they will prevail on the merits of any federal issue, because the sole issue is *where* such merits will be adjudicated. *See Willingham*, 395 U.S. at 407 (holding that a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").

101.    Despite the Attorney General's attempt to characterize its claims as sounding in state consumer protection law, this suit arises from Defendants' production, promotion, and sale of fossil fuels—including such activities conducted under the direction of federal officers for decades—and Defendants' allegedly deceptive promotions to "maintain their profits from fossil fuel sales." Compl. ¶ 67. As explained above, the Complaint aims to reduce or altogether stop Defendants' promotion, and thereby their production and sale, of fossil fuels, the combustion of which is allegedly "the main human influence" on climate change. *See, e.g.*, Compl. ¶ 1(d). Where both the plaintiff and the defendants have "reasonable theories of this case," the court's role is "to credit only the [defendants'] theory" so long as it is "plausible." *Baker*, 962 F.3d at 941, 947. Defendants' theory that Vermont consumers' purported injuries necessarily are predicated upon

Defendants' extraction, production, and sale of fossil fuels—much of which takes place at the direction of the federal government—is more than plausible, and should be credited by this Court.

### B.  Defendants Satisfy All Elements of the Federal Officer Removal Statute.

102.   Defendants satisfy all three elements of the federal officer removal statute here.

103.   ***First***, Defendants are "persons" within the meaning of the statute who "acted under" federal officers. Defendants are corporations, Compl. ¶¶ 9–27, which qualify as "persons" within the meaning of section 1442. *Isaacson*, 517 F.3d at 135–36. Defendants have "acted under" federal officers because the U.S. government has exerted extensive guidance and control over Defendants' production and supply of oil and gas, and Defendants "through contractual relationships with the Government, perform[ed] jobs that the Government otherwise would have performed" itself. *Id.* (citing *Watson*, 551 U.S. at 153–54). Indeed, Defendants have "acted under" federal officers in numerous ways, including by: (1) supplying the federal government with highly specialized, noncommercial-grade fuels for military use; (2) producing oil and gas for the U.S. military during wartimes under specific government guidance and directives; (3) constructing pipelines for oil transportation at the federal government's direction and control; (4) building, operating, and managing government petroleum production facilities; (5) supplying fuel for and managing the Strategic Petroleum Reserve and allocating their products pursuant to the Emergency Petroleum Allocation Act; and (6) developing mineral resources on the Outer Continental Shelf ("OCS") and other federal lands through highly technical leases that were overseen and managed by federal supervisors.

104.   ***Second***, the Attorney General's claims relate to the actions Defendants performed "under color of federal office" because the claims are "*connected or associated*, with acts under color of federal office." *Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc). As explained above, the Complaint targets Defendants' production and supply of oil

and gas—conduct that occurred, at least in part, "*because* of what [Defendants] were asked to do by the Government." *Isaacson*, 517 F.3d at 137; *see also Baker*, 962 F.3d at 945 (removal appropriate where plaintiffs challenge even a "small, yet *significant*" portion of defendants' conduct under federal officers).[17]

105.    ***Third***, Defendants have several "colorable federal defenses," the government-contractor defense, preemption, federal immunity, and defenses based on the commerce clause, due process clause, the foreign affairs doctrine, and the First Amendment.

### 1.    *Defendants "Acted Under" Federal Officers.*

106.    Oil and gas are at the heart of economic, energy, and security policies of the United States, and have been for decades. It has long been the policy of the United States that fossil "fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports." 42 U.S.C. § 15927(b)(1); *see also Final List of Critical Minerals 2018*, 83 Fed. Reg. 23295, 23296 (May 18, 2018) ("[F]ossil fuels" are "indispensable to a modern society for the purposes of national security, technology, infrastructure, and energy production."). As Professor Mark R. Wilson explains: "Over the last 120 years, the U.S. government has relied upon and controlled the oil and gas industry to obtain oil and gas supplies and expand the production of petroleum products, in order to meet military needs and enhance national security." Ex. 7 ¶ 1.

---

[17]    It is generally accepted that greenhouse gases from fossil fuel combustion, such as carbon dioxide, remain in the atmosphere for hundreds of, or even a thousand, years. *See* Alan Buis, *The Atmosphere:    Getting a Handle on Carbon Dioxide*, NASA (Oct. 9, 2019), https://climate.nasa.gov/news/2915/the-atmosphere-getting-a-handle-on-carbon-dioxide (explaining that carbon dioxide lasts in the atmosphere "between 300 to 1,000 years"). By seeking to punish Defendants for alleged harms associated with Defendants' products, the Complaint necessarily challenges the decades' worth of Defendants' activities under federal officers discussed in Section III.B.1, including Defendants' production and supply of oil and gas during World War II and the Korean War.

107.    Defendants "acted under" federal officers because the government exerted extensive "subjection, guidance, or control" over Defendants' fossil fuel production and supply and because Defendants engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 143, 152; *see also St. Charles Surgical Hosp., L.L.C.* v. *Louisiana Health Serv. & Indem. Co.*, 990 F.3d 447, 454–55 (5th Cir. 2021) ("[A] removing defendant need not show that its alleged conduct was precisely dictated by a federal officer's directive. . . . Instead, the 'acting under' inquiry examines the *relationship* between the removing party and relevant federal officer, requiring courts to determine whether the federal officer 'exert[s] a sufficient level of subjection, guidance, or control' over the private actor."); *Agyin*, 986 F.3d at 176–77 ("Cases in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government.") (citing *Ruppel* v. *CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)).

108.    At bottom, the Attorney General challenges Defendants' production and supply of fossil fuels, including to the federal government. The federal government relies on private firms like Defendants to produce and supply oil, gas, and petroleum products, which the government otherwise would need to do itself. Defendants thus have "assist[ed]" the federal government "in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm." *Cnty. Bd. of Arlington Cnty., Virginia* v. *Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 253 (4th Cir. 2021) (quoting *Watson*, 551 U.S. at 153–54). As the examples below demonstrate, the federal government has relied on Defendants to produce and supply oil and gas and associated products, including from federal lands and specialized jet fuels for the military. Absent Defendants' production and supply, the government itself would have had to perform these tasks.

109.    Where, as here, a private party has specifically contracted with "the Government to produce an item that it needs," such assistance "goes beyond simple compliance with the law" and satisfies the "acting under" prong. *Baker*, 962 F.3d at 942; *see also Arlington*, 996 F.3d at 251-52 ("[C]ourts, like this one, 'have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*.'" (quoting *Sawyer* v. *Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017))); *Agyin*, 986 F.3d at 175 ("The Supreme Court has said, for example, that a private company acting pursuant to a contract with the federal government has this ['acting under'] relationship."). Because Defendants have produced and supplied significant quantities of fossil fuel products in furtherance of federal objectives pursuant to contracts with the U.S. government and under the U.S. government's direction, control, and "close supervision," Defendants have a "special relationship" with the U.S. government that satisfied the "acting under" element of the federal officer removal test. *Isaacson*, 517 F.3d at 137.

110.    Defendants acted under federal officers in many respects, each directly stemming from the U.S. government's policies to promote the production of oil and gas to meet the country's military and national economy needs—even as the public and the world increasingly recognized and understood the link between greenhouse gas emissions and global climate change. Each of the examples below demonstrates that Defendants have produced or supplied oil and gas under the direction, supervision, and control of the federal government. Any one of them alone is sufficient to support federal officer removal, and each demonstrates the strong federal interest in petroleum, which the Attorney General now seeks to disrupt.[18]

---

[18]    These examples are by no means an exhaustive collection of the factual bases that support the grounds for removal asserted herein. Defendants expressly reserve all rights to include

### (a)   Defendants Acted Under Federal Officers by Supplying Highly Specialized Fuels for Military Use.

111.   Defendants acted under federal officers by producing and supplying highly specialized, noncommercial-grade fuels for the military that continue to be the "lifeblood of the full range of Department of Defense ["DOD"] capabilities." Ex. 8. Federal officer removal precisely "covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Ruppel*, 701 F.3d at 1181.

112.   During World War II, for instance, the federal government asserted substantial control over Defendants,[19] directing the development and production of high-octane aviation fuels ("avgas").[20] Because avgas was "the most critically needed refinery product during World War II and was essential to the United States' war effort," *Shell Oil Co.* v. *United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) ("*Shell II*"), the United States government "exercised significant control" over the means of its production, including production by Defendants, during World War II. "The government exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor," *Exxon Mobil Corp.* v. *United States*, 2020 WL

---

additional support for any and all grounds for removal in any further briefing should the Attorney General challenge removal.

[19]   The Complaint improperly conflates the activities of Defendants with their separately organized predecessors, subsidiaries, and affiliates. Although Defendants reject the Attorney General's attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this Notice of Removal only, Exxon Mobil Corporation and ExxonMobil Oil Corporation describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that the Complaint, as pleaded, can and should be removed to federal court.

[20]   Approximately 80 percent of the seven billion barrels of crude oil needed to support the U.S. war effort was produced in this country. Ex. 9, at 169.

5573048, at *1 (S.D. Tex. Sept. 16, 2020), in order to maximize production of fuel for the military and direct the allocation of pivotal resources, *see, e.g.*, *United States* v. *Shell Oil Co.*, 294 F.3d 1045, 1049–50 (9th Cir. 2002) ("*Shell I*").

113. As another example, Shell Oil Company developed and produced for the federal government specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs during the Cold War.[21] Shell Oil Company produced millions of gallons of "Processing Fluid (PF-1)" under government contracts with specific testing and inspection requirements, as well as packaging that mandated "no other identification." Ex. 12; *see also* Ex. 13. Shell Oil Company also constructed "special fuel facilities" to handle and store PF-1, including a hangar, pipelines, and storage tanks at Air Force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program. Exs. 14–19. Under the OXCART program, Shell Oil Company "tested" "refinery procedures" to ensure fuels were "up to standard." Ex. 20, at 4. In providing specialized fuel and facilities under contracts for the federal government's overhead reconnaissance programs, Shell Oil Company acted under federal officers, *see, e.g.*, Ex. 14, at 1 ("This work is under the technical direction of Colonel H. Wilson"), and helped the government to produce an essential item that it needed for national defense purposes, *see Watson*, 551 U.S. at 153.

---

[21] *See* Ex. 10, at 61-62 ("Gen. James H. Doolittle (USAF, Ret.) . . . arranged for Shell to develop a special low volatility, low-vapor-pressure kerosene fuel for the craft. The result was a dense mixture, known as LF-1A, JP-TS (thermally stable), or JP-7, with a boiling point of 300°F at sea level. Manufacturing this special fuel required petroleum byproducts."); Ex. 11, at 24 ("The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . The extreme environment presented a severe cooling problem . . . A new fuel and a chemical lubricant had to be developed to meet the temperature requirements . . . . Shell, and [other] [c]ompanies[,] took on the task of developing these fluids.").

114.     To this day, Defendants continue to supply DOD with highly specialized fuels to meet its need to power planes, ships, and other vehicles, and to satisfy other national defense requirements.  Attempting to sharply curtail Defendants' fossil fuel production, promotion, and sales under state law could impair or encumber these federal contracts.  U.S. Navy Captain Matthew D. Holman recently explained that "[f]uel is truly the lifeblood of the full range of DOD capabilities, and, as such, must be available on specification, on demand, on time, every time.  In meeting this highest of standards, we work hand-in-hand with a dedicated team of Sailors, civil servants and contractors to deliver fuel to every corner of the world, ashore and afloat."  Ex. 8 at 2.  "By 2010, the U.S. military [was] the world's biggest single purchaser and consumer of petroleum products," and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel."  Ex. 7 ¶ 40.  Shell Oil Company and ExxonMobil Corporation (or their predecessors, subsidiaries, or affiliates) have been two of the top four suppliers of fossil fuel products to the U.S. military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").  *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009), https://fas.org/sgp/crs/natsec/R40459.pdf.  DESC procures a range of military-unique, petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative fuels.  In fiscal year 2008, for example, the DESC purchased 134.9 million barrels of fuel products in compliance with military specifications, totaling $17.9 billion in procurement actions.  *See id.* at 2.  And the "U.S. military services and the North Atlantic Treaty Organization forces use an estimated 5 billion gallons of JP-8 [jet fuel] each year."  Subcommittee on Jet-Propulsion Fuel 8,

Committee on Toxicology, National Research Council, Toxicologic Assessment of Jet-Propulsion Fuel 8 (2003), https://www.ncbi.nlm.nih.gov/books/NBK207616/.

115.     In addition, from at least 2010-2013, Shell Oil Company or its affiliates entered into billion-dollar contracts with DOD's Defense Logistics Agency ("DLA") to supply specialized JP-5 and JP-8 military jet fuel.[22]  *See* Exs. 21–29.  These are not commercial-grade, off-the-shelf products.  For example, "JP-5 is a military unique fuel because it must have a flash point substantially higher than commercial aviation turbine fuels.  It is stored in large quantities on aircraft carriers and other vessels.  The flash point is for safety in these military unique applications."  Ex. 30 at 11, § 6.1.  DOD's detailed specifications for the makeup of the military jet fuels require that they "shall be refined hydrocarbon distillate fuel oils" made from "crude oils" and "require military unique additives that are necessary in military weapon systems."  *Id.* at 5, 11, §§ 3.1, 6.1.[23]  The specialized additives are "unique to military aircraft, engine designs, and missions," *id.* at 11, § 6.1, and include fuel system icing inhibitor ("FSII") and corrosion inhibitor/lubricity improver ("CI/LI"), *id.* at 2, 6; *see also* Ex. 33; Ex. 34.  Such additives are essential to support the high performance of the military engines they fuel and meet the DOD's unique operational needs—for example, by ensuring that the specialized military fuels ignite, and do not freeze, at low temperatures from high altitudes, do not corrode aircraft engines or result in fuel control malfunctions, and rapidly dissipate accumulated static charge so as not to produce sparks or fires during rapid refueling.[24]

---

[22]    These contract examples are not an exhaustive collection of the contracts that Defendants executed with the federal government to supply specialized military fuels during the relevant time period.

[23]    *See also* Ex. 31 at 6, 14, §§ 3.1, 6.1; Ex. 32 at 6, 12, §§ 3.1, 6.1.

[24]    *See* Ex. 35 at 9–10, § 1.4.1 (describing JP-8 additives; noting that "when jet fuel (a relatively poor conductor) moves through a hose, valve, or filter, a static charge can be created" and "a

116.    DOD's detailed specifications for the makeup of these military jet fuels and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Defendants and the government. *See Baker*, 962 F.3d at 943 (holding that the government's detailed specifications for the makeup of materials and the compulsion to provide the product to the government's specifications demonstrated the necessary "acted under" relationship to support federal officer removal); *Arlington*, 996 F.3d at 252–54 (finding "acting under" prongs satisfied where defendants had provided services to federal officers pursuant to detailed contracts requiring special formulations and imposing pricing, delivery, and audit/inspection rights).   These specialized jet fuels are not the category of heavily regulated civilian products such as those described by the Supreme Court in *Watson*; rather, they are designed specifically to assist the military in fulfilling its unique and essential missions and thus fall into the category of specialized military products that support federal officer jurisdiction. *See Watson*, 551 U.S. at 154 ("Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war."); *Winters* v. *Diamond Shamrock Chem. Co.*, 149 F.3d 387, 389-99 (5th Cir. 1998); *Baker*, 962 F.3d at 946.

### (b)    Defendants Acted Under Federal Officers during the Korean War and World War II.

117.    At the advent of the Korean War, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81-774, 123 Stat. 2006 ("DPA").   The PAD issued production orders to Defendants and

---

discharge in the form of a spark could . . . induce an explosion" and "[m]ilitary jet fuels require the use of a conductivity improver additive – Static Dissipator Additive"); Ex. 36 at tbl. 1, pp. 2–9, 36–51 (describing military jet fuels and additives).

other oil and gas companies, including to ensure adequate quantities of avgas for military use.[25] As Professor Wilson explains, the DPA "gave the U.S. government broad powers to direct industry for national security purposes," and the "PAD directed oil companies to expand production during the Korean War, for example, by calling on [the] industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952." Ex. 7 ¶ 28.

118.   The government also invoked the DPA immediately after the 1973 Oil Embargo to address immediate and critical petroleum shortages by the military. Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the [DOD]" and provided companies that complied with immunity from "damages or penalties." Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30572 §§ 1, 3 (Nov. 6, 1973). The Interior Department subsequently "issued directives to 22 companies [including Defendants or their predecessors or subsidiaries] to supply a total of 19.7 million barrels of petroleum during the two-month period from November 1, 1973, through December 31, 1973, for use by the DOD."[26] By complying with these production orders, Defendants "*assist[ed]*" with "the duties or tasks of the federal superior" to alleviate petroleum shortages that posed a grave threat to the nation's security forces. *Watson*, 551 U.S. at 152.

119.   Decades earlier, as the United States prepared to enter World War II, its need for large quantities of oil and gas to produce avgas for planes, oil for ships, lubricants, and synthetic rubber far outstripped the nation's current capacity. The government created agencies to control

---

[25]   *See* Ex. 37, at 122. *See also Exxon Mobil Corp.*, 2020 WL 5573048, at *15 (detailing the government's use of the DPA "to force" the petroleum industry to "increase their production of wartime . . . petroleum products").

[26]   Ex. 38, at 78. The companies included Amoco Oil Co., Atlantic Richfield Co., Exxon Co., U.S.A., Mobil Oil Corp., and Shell Oil Co. *Id.* (listing companies and quantities); Ex. 39 (reporting on directives).

the petroleum industry, including Defendants, to build refineries; direct the production of certain petroleum products; and manage scarce resources for the war effort. "No one who knows even the slightest bit about what the *petroleum industry* contributed to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government* . . . in bringing about a victory." Ex. 40, at 1 (emphasis added).

120.    In 1941, President Roosevelt created the Office of Petroleum Coordinator and designated Interior Secretary Harold Ickes as the Petroleum Coordinator for National Defense. *See Exxon Mobil Corp.*, 2020 WL 5573048, at *10. President Roosevelt explained that:

> Recent significant developments indicate the need of coordinating existing Federal authority over oil and gas and insuring that the supply of petroleum and its products will be accommodated to the needs of the Nation and the national defense program. . . . One of the essential requirements . . . which must be made the basis of our petroleum defense policy . . . is the development and utilization with maximum efficiency of our petroleum resources and our facilities, present and future, for making petroleum and petroleum products available, adequately and continuously, in the proper forms, at the proper places, and at reasonable prices to meet military and civilian needs.

*Id.* The Office of Petroleum Coordinator issued "directives" and "recommendations" to the oil and gas industry, requiring refineries to prioritize the production of aviation gasoline.

121.    In 1942, President Roosevelt established several agencies to oversee wartime production. Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW"). The WPB established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production; it also limited the production of nonessential goods. The PAW centralized the government's petroleum-related activities. It made policy determinations regarding the construction of new facilities and allocation of raw materials, had the authority to issue production

orders to refineries and contracts that gave extraordinary control to federal officers, and programmed operations to meet new demands, changed conditions, and emergencies. *See generally Shell I* (discussing federal control). The "PAW" told the refiners what to make, how much of it to make, and what quality.[27] The Office of the Petroleum Coordinator for National Defense stated that "[i]t is *essential*, in the national interest that the supplies of all grade of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*."[28]

122.    The PAW's directives to Defendants were often coercive. The PAW's message to the oil and gas industry was clear:  it would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way." Ex. 41, at 8. The PAW maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance." Ex. 42, at 1. In sum, the federal government developed an array of directions, threats, and sanctions to ensure Defendants assented to PAW's production directives. The structure of the wartime relationship between PAW and Defendants was one of "subjection, guidance, or control" over Defendants' petroleum production, which satisfies the "acting under" requirement of section 1442(a)(1). *St Charles Surgical Hosp.*, 990 F.3d at 455.

---

[27]    *Shell II*, 751 F.3d at 1286 (quoting John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945*, at 219 (1946)); *see also* Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 36 at 11 (Nov. 28, 1945) ("The supply of crude to each refinery, the finished and intermediate products to be made in each plant, and the disposition of the products were all closely scheduled, by daily telegraphic directives when necessary."); Ex. 40 at 212 ("PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by each company and the time when the product would be available.").

[28]    *Shell II*, 751 F.3d at 1286 (quoting Office of Petroleum Coordinator for National Defense Recommendation No. 16).

123.    The court in *Exxon Mobil Corp.* acknowledged the long history of federal government control over Defendants' lawful oil production-related activities in finding that the government was responsible for certain environmental response costs under CERCLA: "By controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry." 2020 WL 5573048, at *11.   The court rejected the argument that private refiners "voluntarily cooperated" and instead found that they had "no choice" but to comply with the federal officers' direction. *Id.* at 11–12 (relying on testimony of J. Howard Marshall, the former Chief Counsel for PAW, who stated "companies that 'weren't making essential war materials' were simply not able to run their refineries."). In fact, the federal government "insist[ed] on having the plants operate 24 hours a day, 7 days a week, year round." *Id.* at *8. Put simply, the federal government "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *14. Certain Defendants or their predecessors or subsidiaries also produced toluene, a component of the explosive TNT, under "direct contract with the Army Ordnance Department." Ex. 9 at 222; *see Exxon Mobil Corp.*, 2020 WL 5573048, at *13. The controls placed on the production of petroleum during World War II extended through the Korean War. *See Exxon Mobil Corp.*, 2020 WL 5573048, at *15 (detailing the government's use of the Defense Production Act of 1950 "to force" the petroleum industry to "increase [its] production of wartime . . . petroleum products").

124.    DOD is the nation's single largest consumer of energy, and one of the world's largest users of petroleum fuel. *See* Ex. 43 (discussing FY 2019 military fuel procurement). For more than a century, "these products [have been] used for the war effort," including "many 'ordinary' products [that are] *crucial* to the national defense, such as . . . fuel and diesel oil used in the Navy's ships; and lubricating oils used for various military machines." *Exxon Mobil Corp.*,

2020 WL 5573048, at *31 (emphasis added); *see also id.* at *47 (noting the "value of [the] petroleum industry's contribution to the nation's military success"). As two former Chairmen of the Joint Chiefs of Staff explained, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'" spans "more than a century," and during their tenure, petroleum products were "crucial to the success of the armed forces." Ex. 44, at 2–3. "Because armed forces have used petroleum-based fuels since the 1910s, oil companies have been essential military contractors, throughout the last century." Ex. 7 ¶ 2. The "U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime." *Id.* Defendants' decades-long contractual relationship with the federal government to produce critical fuels that it needs for the U.S. military and during times of war—products that, "in the absence of Defendants, the Government would have had to produce itself"—is a classic example of the "special relationship" with federal officers sufficient to satisfy the "acting under" prong. *Isaacson*, 517 F.3d at 137.

### (c)    Defendants Acted Under Federal Officers by Constructing Pipelines for Oil Transportation.

125.    Defendants also acted under the federal government as agents in constructing and operating pipelines transporting oil for war. During World War II, oil transportation by tankers "experienced major disruption as a result of attacks by German submarines." Ex. 45, at 3. "To [e]nsure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfields and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively" (together, the "Inch Lines"). *Schmitt* v. *War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*"). War Emergency Pipelines, Inc. ("WEP"), "a Delaware corporation created

by eleven of the major oil companies," including predecessors or affiliates of Defendants,[29] constructed and operated the Inch Lines "under contracts" and "as agent" for the federal government. *Id*; *Schmitt* v. *War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 158 (E.D. Ark. 1947) ("*WEP I*").[30]

126.    Federal officers exerted operational control over the Inch Lines and Defendants' affiliates. WEP operated wholly on capital from the government, and "received no fee or profit." *WEP II*, 175 F.2d at 336; *see also, e.g.*, *WEP I*, 72 F. Supp. at 158. The government also required approval and set the salaries of all personnel that WEP employed. *SEE WEP II*, 175 F.2d at 336.

127.    Petroleum Directives 63 and 73 governed the Big Inch and Little Big Inch pipelines, respectively, and exerted substantial control over WEP, and thus Defendants. The government required WEP to prepare and file "daily reports" and a monthly "forecast" regarding its operation of the Inch Lines."[31] The government had power to "direct such affirmative action as may be necessary to accomplish the purposes of" the Inch Lines—namely, "relieving shortages" and "augmenting supplies for offshore shipments" while replacing "tankers normally engaged in the transportation of petroleum products from the United States Gulf Coast to Atlantic ports" that were

---

[29] The eleven companies that constituted WEP were Shell Oil Company, Inc., Standard Oil Company (New Jersey), The Texas Company, Gulf Refining Company, Pan American Petroleum & Transport Company, Cities Service Company, Atlantic Pipe Line Company, Sinclair Oil Corporation, Sun Pipe Line Company (Texas), Socony Vacuum Oil Company, Inc., and Tidal Pipe Line Company. Several of these companies are predecessors or affiliates of current Defendants. *See* Ex. 46.

[30] These decisions provide details of the construction contracts under which the government "delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement.'" *WEP I*, 72 F. Supp. at 157.

[31] Utilization of War Emergency Pipeline, 8 Fed. Reg. 1068-69 (Jan. 20, 1943) (Petroleum Directive 63); War Emergency Petroleum Products Pipeline, 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73).

"los[t] through enemy action." *Id.* The goal was to ensure "maximum operating capacity for the prosecution of the war and most effective utilization of petroleum." *See* Ex. 47, at 25–26 ("Under wartime operation, the oil business operated under directives of the Petroleum Administration for War. . . . [oil industry] was ordered to divert oil and deliver at the receiving terminals of the big lines sometimes by expensive means to keep these lines running to capacity, and that was done in the interest of the war effort because we needed every barrel of oil we could deliver to the East.").

128.    The government controlled all oil that WEP moved through the pipelines on its behalf.[32] During their operation by WEP, the Inch Lines provided "life lines to the east," delivering "379,207, 208 barrels of crude oil and refined products" and serving "military necessity" for "the cross-Atlantic fronts." Ex. 9, at 104–05, 108. Defendants thus "provided the federal government with materials that it needed to stay in the fight at home and abroad." *Baker*, 962 F.3d at 942. Without Defendants as contractors and agents (via WEP), "the Government itself would have had to perform" these essential wartime activities. *Watson*, 551 U.S. at 154.

## (d)    Defendants Acted Under Federal Officers by Constructing, Operating, and Managing Government Petroleum Production Facilities.

129.    Defendants also acted under the federal government by operating and managing government-owned and/or government-funded petroleum production facilities. During World War II, the government built "dozens of large government-owned industrial plants" that were "*managed by private companies under government direction.*" Ex. 7 ¶ 14 (emphasis added). These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or of government-

---

[32]    8 Fed. Reg. at 1069, § 1555.1(e)(4) ("No petroleum or petroleum products shall be transported through the facilities of the War Emergency Pipeline System except in pursuance of this Directive or amendments and supplements thereto."); *id.* at 13343, § 1555.2(d)(3) (same).

owned equipment within industrial facilities. *Id.* ¶ 19. Some Defendants or their predecessors operated such production equipment and facilities for the government, building plants and manufacturing war products for the Allied effort. *Id.* ¶ 20.

130. For example, "[o]n January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two-year period. The contract provided that Shell would construct a toluene plant at Shell['s] Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. . . . Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war" "to manufacture TNT" and later "as a blending agent" to make "avgas." Ex. 48, at 94; *see also* Ex. 7 ¶ 23.

131. In addition, the government's need for highly specialized fuels, as discussed above, necessitated changes to Defendants' refining equipment and operations. *See* Ex. 49, at 40 ("The refiner cannot build the equipment for making the fuel without knowing what its composition must be to meet the needs of the engine."). The impact of the government's particular fuel specifications on Defendants' operations were typically long-lasting. For example, JP-4 was developed in 1951 and was the most heavily used Air Force fuel until it was phased out around 1998. *See* Ex. 50.

132. The federal government entered into contracts with predecessors or affiliates of Defendants Shell Oil Company and ExxonMobil to obtain "vast quantities of avgas."[33] These contracts provided federal officers with the power to direct the operations of Defendants' facilities. For instance, the government's contract with Shell Oil Company's predecessor or affiliate

---

[33] Several prior decisions discuss these contracts and the power that the federal government held over Defendants to control production of oil and gas. *See, e.g.*, *Shell II*, 751 F.3d at 1286; *Exxon Mobil Corp.*, 2020 WL 5573048, at *31.

specified that it "*shall* use its best efforts" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943." *Shell Oil Co.* v. *United States*, No. 1:06-cv-00141-SGB (Fed. Cl. Nov. 20, 2012), ECF No. 106-1 (emphases added).   To maximize production of this critical product, "[t]he Government directed [those companies] to 'undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts.'" *Shell II*, 751 F.3d at 1287 (citation omitted).  At the federal government's direction, the oil companies, including certain Defendants here, increased avgas production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied success in the war." *Id.*

133.    With respect to Exxon Mobil Corporation's affiliates, the federal government "exerted substantial control and direction over the refineries' actions, including decisions on how [and when] to use raw materials and labor." *Exxon Mobil Corp.*, 2020 WL 5573048, at *1, *8. Courts have concluded that, "[b]y controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry," and that it "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id.* at *11, *14.  By helping the government produce essential items that it needed for national defense purposes, *see Watson*, 551 U.S. at 153–54, Defendants "acted under" a federal officer for purposes of the removal statute.

> **(e)    Defendants Acted Under Federal Officers by Supplying and Managing the Strategic Petroleum Reserve and Allocating Products Pursuant to the Emergency Petroleum Allocation Act.**

134.    In response to the Oil Embargoes of the 1970s, Congress also created the Strategic Petroleum Reserve ("SPR") in the Energy Policy and Conservation Act of 1975, Pub L. No. 94-

163, 89 Stat. 871, to protect the country's energy security. The SPR was a "stockpile of government-owned petroleum" managed by the Department of Energy ("DOE") and created "as a response to gasoline supply shortages and price spikes . . . to reduce the impact of disruptions in supplies of petroleum products and to carry out U.S. obligations under the 1974 Agreement on an International Energy Program."[34] Several Defendants "acted under" federal officers in producing oil for the SPR and managing it for the federal government.

135.    The Act declared "it to be U.S. policy to store up to 1 billion barrels of petroleum products, provid[ed] for an early reserve, to contain at least 150 million barrels by December 1[9]78, and for an eventual storage system of at least 500 million barrels by December 1982." Ex. 51 at 30. From 1999 through December 2009, the U.S. government's "primary means of acquiring oil for the SPR" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called Royalty In Kind ("RIK") program.[35] During that time "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion. Ex. 52, at 18, 37.

136.    The federal government required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay these RIKs, which the government used for its strategic stockpile, a crucial element of U.S. energy security and treaty obligations. *See* Ex. 53. The federal government also contracted with some of the Defendants (including their predecessors, subsidiaries, or affiliates) to deliver to the SPR millions

---

[34]    *See* H.R. Rep. No. 115-965, at 3 (2018), https://www.congress.gov/115/crpt/hrpt965/CRPT-115hrpt965.pdf.

[35]    U.S. Dep't of Energy, Off. of Energy & Carbon Mgmt., *Filling the Strategic Petroleum Reserve* (last visited Oct. 20, 2021), https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve.

of barrels of oil under the RIK program, Ex. 54, and contracted with those Defendants to assist in the physical delivery of these RIK payments to the Strategic Petroleum Reserve. *See, e.g.*, Ex. 55, at 19.  Some Defendants also acted under federal officers by operating the SPR infrastructure for the government.[36]

137.    The SPR subjects Defendants to the federal government's supervision and control in the event of the President's call for an emergency drawdown.[37]  The United States has exercised this control, including as a result of President Bush's Executive Order to draw down the reserve in response to Hurricane Katrina in 2005, and President Obama's Executive Order to draw down the reserve in response to disruptions to oil supply in Libya in 2011.  *See* Ex. 56; Ex. 57, at 1, 17, 18, 21.  Thus, the hundreds of millions of barrels of oil flowing through these facilities—the sale and

---

[36]  For example, from 1997 to 2019, the DOE leased to Defendant Shell Oil Company affiliates the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana. *See* Ex. 52 at 16. Under the lease agreement, "Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s required to support the Strategic Petroleum Reserve as a sales and distribution point in the event of a drawdown. *Id.*

In January 2020, the DOE leased the St. James facilities to an affiliate of Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline Company). *See* Press Release, U.S. Dep't of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil.        Similarly, ExxonMobil Pipeline Company was required to "make monthly lease payments; be responsible for operations and maintenance of the facility; and provide use of the facility in support of Government emergency oil drawdowns." *Id.* And the DOE has leased to the same ExxonMobil affiliate two government-owned pipelines that are part of the SPR near Freeport, Texas. *See* Press Release, U.S. Dep't of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[37]  *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under the international energy program.").

combustion of which are necessarily part of the causal chain that forms the basis of the Attorney General's claims—were subject to federal government direction, control, and supervision.

138.     Also in response to the oil embargoes of the 1970s, Congress passed the Emergency Petroleum Allocation Act of 1973, Pub. L. No. 93-159, 87 Stat. 627, to manage shortages and "distribute [petroleum products] fairly across the total spectrum of petroleum use in this country." Ex. 58, at 35.   Pursuant to the Act, from 1974 to 1981, the federal government implemented an "omnibus mandatory allocation program covering every facet of the petroleum industry and affecting, if not dictating, virtually every domestic transaction involving crude oil and covered petroleum products."[38]   This program required that Defendants distribute available gasoline supplies to wholesale purchasers (largely service stations) on a pro rata basis. *See* Ex. 58, at 37. Further, the program mandated that Defendants regularly report to the federal government on their crude oil supplies and refining activities; when a Defendant's crude oil supplies exceeded a certain benchmark, it was forced to sell to others who fell below that benchmark. *See id.* at 41.   Congress deemed the allocation system, and the oil companies' participation in it, necessary due to "shortages of crude oil" that constituted "a national energy crisis which is a threat to the public health, safety, and welfare" requiring "prompt action by the Executive branch."   Emergency Petroleum Allocation Act § 2(a)(1) & (3).   By "work[ing] hand-in-hand with the government, assisting the federal government" to achieve a task that furthers the objectives of the federal government, Defendants were "acting under" federal officers. *Ruppel*, 701 F.3d at 1181.

---

[38]   *Emergency Petroleum Allocation Act Extension: Hearing on H.R. 15905, H.R. 151000, H.R. 15491, H.R. 16116, H.R. 16303, H.R. 16757, and S. 3717 (and all identical bills) Before the Subcomm. on Communications and Power of the H. Comm. on Interstate and Foreign Commerce*, 93d Cong. 8 (1974) (statement of Hon. John C. Sawhill, Deputy Administrator, Federal Energy Office).

**(f)    Defendants Acted Under Federal Officers by Developing Mineral Resources on the Outer Continental Shelf and Other Federal Lands.**

139.    The federal government has contracted with Defendants to develop federal mineral resources on the government's behalf.  The government considered creating a national oil company for this purpose, but instead chose to create a leasing program through which it closely supervised and controlled oil and gas companies, including Defendants.

140.    Congress first passed OCSLA in 1953, providing federal control over the OCS to ensure the "expeditious and orderly development" of what it recognized to be a "vital national resource" in "a manner which is consistent with . . . national needs."  43 U.S.C. § 1332(3).  The initial regulations "went well beyond those that governed the average federally regulated entity at that time." Ex. 59 ¶ 19. As Professor Priest explains:  "An OCS lease was a contractual obligation on the part of lessees to ensure that all operations '*conform to sound conservation practice*' . . . and *effect the maximum economic recovery*' of the natural resources on the OCS." *Id.* (citing 19 Fed. Reg. 90 (May 8, 1954), C.F.R. § 250.11, 2656 (emphases added).  Notably, the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS." *Id.* ¶ 20.

141.    Federal officials in the Department of the Interior—whom the Code of Federal Regulations called "supervisors"—exerted substantial control and oversight over Defendants' operations on the OCS from the earliest OCS exploration. *See id.* ¶¶ 19–20.  Federal supervisors had complete authority to control and dictate the "rate of production from OCS wells," *id.* ¶ 26, and had the authority to suspend operations in certain situations, *id.* ¶ 20.  The supervisors also "had the final say over methods of measuring production and computing royalties," which were based on "the estimated reasonable value of the product as determined by the supervisor." *Id.* (internal quotation marks omitted).  As Professor Priest explains, these federal officials "did not

engage in perfunctory, run-of-the-mill permitting and inspection." *Id.* ¶ 22. Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands. *Id.* ¶ 28.

142.     In addition, the federal government exerted substantial control by issuing highly specific and technical orders, known as "OCS Orders," which, among other things:  "specified how wells, platforms, and other fixed structures should be marked"; "dictated the minimum depth and methods for cementing well conductor casing in place"; "prescribed the minimum plugging and abandonment procedures for all wells;" and "required the installation of subsurface safety devices . . . on all OCS wells." *Id.* ¶ 24 (citations omitted).  Professor Priest observes that through these OCS Orders, federal officials "exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety." *Id.* ¶ 25.  These controls went far beyond typical regulations, as the federal government imposed requirements as the resources owner to achieve its economic and policy goals. *See, e.g.*, *id.* ¶¶ 28, 32.

143.     The growing influence of OPEC, the quadrupling of oil prices during the energy crises of the 1970s, and the now-infamous gas lines, price controls, and rationing that accompanied these energy crises spurred the U.S. government to take action over the ensuing decades to quickly and dramatically increase oil production on the OCS. *See* U.S. Dep't of Energy, *National Energy Plan II*, (May 1979).

144.     For example, in 1973, President Nixon established the goal of energy independence for the United States by 1980.  He ordered the Secretary of the Interior to "increase the acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally

been planned.  Special Message to the Congress on the Energy Crisis, 1 Pub. Papers 17, 29 (Jan. 23, 1974), https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001/69?rgn=full+text;view=image.

145.    In 1978, Congress amended OCSLA to further encourage the leasing of the OCS to meet national energy and security needs created by the oil embargoes of the 1970s.  Congress's express purpose in amending the statute was to foster "expedited exploration and development of the OCS in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments." 43 U.S.C. § 1802(1); *see California ex rel. Brown* v. *Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981).  Congress expressly underscored the national public interest in "develop[ing] oil and natural gas resources in the [OCS] in a manner which is consistent with the need . . . to make such resources available to meet the Nation's energy needs as rapidly as possible." 43 U.S.C. § 1802(2).

146.    During the debate over the 1978 amendments, Senator Fritz Hollings proposed that the federal government create a national oil company to facilitate the development of oil and gas on the OCS. Ex. 59 ¶ 52.  "In essence, Hollings called for the creation of a national oil company that would 'conduct this program by using the same drilling and exploration firms that are usually hired by oil companies.'" *Id.* (internal citation omitted).  The proposal to create a government agency to develop the OCS was ultimately rejected—instead, the government decided to contract with private energy companies to perform these essential tasks on its behalf with expanded oversight and control by the government. *See* Ex. 60, at 9275–76.

147.    This was not the only proposal at the time to create a national oil company. *See* Ex. 59 ¶¶ 52–53; 121 Cong. Rec. H4490 (daily ed. Feb. 26, 1975) (statement of Rep. McFall); Ex. 60, at 9275–76.  Another proposal "would have formally established a 'Federal Oil and Gas Corporation'" that would be "'owned by the federal government' and 'in case of any shortage of

natural gas or oil and serious public hardship, could itself engage in production on Federal lands in sufficient quantities to mitigate such shortage and hardship.'" Ex. 59 ¶ 53. Yet another proposal, from Representatives Harris and McFall, "would provide for the establishment of a National Energy and Conservation Corporation—to be called Ampower—similar to the Tennessee Valley Authority." 121 Cong. Rec. 4490 (daily ed. Feb. 26, 1975) (statement of Rep. McFall). These proposals were ultimately rejected in favor of an arrangement by which the government would contract with private companies, including Defendants—acting as agents—to achieve this federal objective with expanded federal supervision and control. *See* Ex. 59 ¶ 55. The result was a closely supervised leasing program directed by the Department of the Interior, providing the federal government with control over the production sufficient to protect the national interests. *See id.* ¶ 46. As the Supreme Court has explained, removal is appropriate where private companies have "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 154.

148.    One of the Federal Energy Administration's first undertakings in 1974 was to propose a significant expansion of the OCS leasing program, because "[r]ecent world events have spotlighted the growing dependence of the United States on imported crude oil and petroleum products" and "[i]nterruptions in oil imports impose severe costs on the United States due to the pervasive economic role of petroleum in almost every sector of the economy." Ex. 61 at App'x 2. This increased OCS leasing represented a crucial federal policy, because "the Outer Continental Shelf represents one of the most important potential sources of increased domestic energy production, [and so] the President has called for an accelerated leasing program as a mechanism to [e]nsure that the most favorable OCS exploration prospects become available for near-term development." *Id.*

149.    The 1978 OCSLA amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align with national goals. *See* H.R. Rep. No. 95-590, at 53 (Aug. 29, 1977), *reprinted in* 1978 U.S.C.C.A.N. 1450 (recognizing that the amendments provided the federal government with the power and oversight capability to "expedite the systematic development of the OCS, while protecting our marine and coastal environment").  The amendments instructed the Secretary to create an oil and gas leasing program on a five-year review cycle that provides as precisely as possible the size, timing, and location of leasing activities "which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. § 1344(a)–(e).  Since 1977, several federal statutes have further expanded the OCS leasing program to promote the development of national energy supplies, including reductions in royalty payments to increase participation by Defendants to explore and develop deepwater resources. *See, e.g.*, Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. No. 104-58, 109 Stat. 557 (1995); Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006).

150.    Later, in the 1990s, the Clinton administration amended OCSLA to permit the Secretary of the Interior to grant certain royalty relief payments aimed at reducing "America's dependence on unreliable sources of imported oil by helping unlock an estimated 15 billion barrels of oil in the central and western Gulf of Mexico" for energy companies' exploration and production. Press Secretary, White House Office of Communications, Statement on North Slope Oil Bill Signing, 1995 WL 699656, at *1 (Nov. 28, 1995). And, in the 2000s, the Bush administration opened up approximately eight million additional acres of OCS lands for leasing in the Gulf of Mexico, stating: "By developing these domestic resources in a way that protects the

environment, we will help address high energy prices, protect American jobs, and reduce our dependence on foreign oil." George W. Bush, *Statement By President George W. Bush Upon Signing* [H.R. 6111], White House Press Release, 2006 U.S.C.C.A.N. S73, S75 (2006).

151.    As Professor Priest explains, these OCS leases are "*not merely commercial transactions* between the federal government and oil companies. They reflect the creation of a valuable national security asset for the United States over time." Ex. 59 ¶ 7(1) (emphasis added). The federal OCS program "procured the services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own." *Id.* The federal government "had no prior experience or expertise," and therefore "had little choice but to enlist the service of the oil firms who did." *Id.* ¶ 18. But it was the federal government, not the oil companies, that "dictated the terms, locations, methods and rates of hydrocarbon production on the OCS" in order to advance federal interests and, accordingly, "the policies and plans of the federal OCS program did not always align with those of the oil firms interested in drilling offshore." *Id.* ¶ 7(2). "Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." *Id.* The importance of the OCS to domestic energy security and economic prosperity has continued to the present, and across every administration. *See id.* ¶ 79. For example, in 2010, President Obama announced "the expansion of offshore oil and gas exploration" because "our dependence on foreign oil threatens our economy." *Id.* ¶ 78.

152.    The OCS leases require Defendants to "maximize the ultimate recovery of the hydrocarbons from the leased area"; require that drilling take place "in accordance with a government approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"; and

specify that the federal government retains the right to oversee the lessee's rate of production from its leases.[39] Prior to exploration, development, or production, lessees must prepare and comply with detailed plans that are subject to comment and amendment by BOEM, state reviewers, or other agencies.[40] Under these requirements, OCS lessees are subject to exacting oversight by BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property. *See, e.g.*, 30 C.F.R. §§ 250.101-115, 250.130-146, 250.168-295, 250.400-463 (BSEE) & 550.101-147 (BOEM). BSEE carefully monitors compliance with the approved plan and must approve any significant modification thereof.

153.    The federal government retains the right to control a lessee's rate of production on the OCS from its lease. *See* Ex. 62 § 10; 43 U.S.C. § 1334(g) (the lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law"). In particular, BSEE may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir. 30 C.F.R. § 250.1159. This requirement has existed since 1974, *see* 39 Fed. Reg. 15885 (May 6, 1974), and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises," 75 Fed. Reg. 20271, 20272 (Apr. 19, 2010).

154.    The United States controls federal mineral lessees like Defendants in other ways. An OCS lessee does not have an absolute right to develop and produce; rather, it has only an

---

[39]    *See generally* Exs. 62–65; Adam Vann, Congressional Research Service, RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multistep process for approval of development plans and BOEM oversight procedures).

[40]    *See* Vann, *supra* note 39, at 11-13.

exclusive right to seek approval from the United States to develop and produce under the lease. *See Sec'y of the Interior* v. *California*, 464 U.S. 312, 337–39 (1984); *Vill. of False Pass* v. *Clark*, 733 F.2d 605, 614–16 (9th Cir. 1984). Nor may a federal lessee assign its lease to another person without express government approval. 30 U.S.C. § 187; 43 C.F.R. § 3106 (onshore leases); 30 C.F.R. §§ 556.701(a), 556.800 (OCS leases). The government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe." Ex. 62 § 14; Ex. 63 § 15(d); *see* 43 U.S.C. § 1341(b). The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. The government reserves the right to purchase up to approximately 16% of lease production, less any royalty share taken in-kind. 43 U.S.C. § 1353(a)(2). The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the DOD (military operations), or the DOE (e.g., Strategic Petroleum Reserve). *Id.* § 1353(a)(3).

155. Through federal leases, the government balances economic development with environmental considerations. The Secretary may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas. 43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area."). The Secretary may suspend production from an OCS lease "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment." 43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons).

156.    As the above statutory and lease provisions demonstrate, a federal oil and gas lease is the means by which the federal government directs a lessee to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives.  These are activities that the federal government would itself have to undertake unless the Defendants did it for the government through the obligations of federal leases on federal lands.  Under *Watson*, this is not run-of-the-mill regulation.  On the contrary, it is the kind of "special relationship" that supports federal officer removal.  *Watson*, 551 U.S. at 157; *Isaacson*, 517 F.3d at 137.

157.    In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department was nearly one billion barrels.  Historically, annual oil and gas production from federal leases has accounted for as much as 35 percent of domestic oil production and 25 percent of domestic natural gas production.  *See* Cong. Research. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.  The federal government has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands through royalty regimes that have resulted in billions of dollars of revenue to the federal government.  If not for Defendants' activities under the direction and control of federal resource-management agencies, the federal government would have needed to perform those activities itself to implement Congress's directives regarding production of oil and gas from the OCS in furtherance of the federal government's energy policy objectives.

158.    Defendants similarly acted under the federal government's direction, supervision, and control in developing mineral resources on federal lands onshore.[41] The Interior Department's Bureau of Land Management ("BLM") leases, like OCS leases, are contracts to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees.  For instance, the Secretary of the Interior may also direct lessees to deliver any reserved production to the General Services Administration (government civilian operations), the DOD (military operations), or the DOE (e.g., Strategic Petroleum Reserve);[42] take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States";[43] reduce or eliminate the United States' royalty share, thereby providing lessees with an additional economic incentive to produce oil and gas;[44] compel lessees to offer a percentage of lease production "small" refiners;[45] and even direct or grant suspensions of operations.[46]  The federal government also uniquely reserves the authority to determine the value of production for purposes of determining how much royalty a lessee owes, which is a provision included in BLM leases.[47]

---

[41]    "Oil and gas produced from the [onshore] Federal and Tribal mineral estate are significant parts of the nation's energy mix. For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States." Ex. 66, at 1.

[42]    43 U.S.C. § 1353(a)(3).

[43]    30 U.S.C. § 192

[44]    43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (Mineral Leasing Act ("MLA") leases).

[45]    43 USC 1353(b).

[46]    See 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.

[47]    See Ex. 65 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products . . . ."). A typical commercial private lease would never reserve similar unilateral

BLM leases further provide that the United States "reserves the right to specify rates of development and production in the *public interest*." Ex. 66 § 4. As with OCS leases, BLM leases require lessees to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest. *Id.* § 6.

159. The federal government's control over onshore and offshore oil and gas production is thus fundamentally different from the government's regulation of tobacco products, which the Supreme Court addressed in *Watson*. There, the Court recognized that a private party does not come within the scope of the federal officer removal statute "simply [by] *complying* with the law." *Watson*, 551 U.S. at 152. Accordingly, "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone," even "if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* at 153. This is because mere regulation does not indicate that the federal government would undertake the regulated activity if private actors did not—the government regulates tobacco products because of their health risks, not because tobacco production is a federal imperative. The Attorney General's claims, by contrast, seek to punish Defendants for activities conducted under the close supervision of the federal government that effectuate national energy policy and support the national defense. The Attorney General's claims thus implicate precisely the type of "special relationship" between private contractors and the federal government that supports federal officer removal. *Id.* at 157.

### 2. *The Attorney General's Claims Are Related to Defendants' Activities "Under Color of Federal Office."*

160. The Attorney General's claims are "for or relating to" acts Defendants performed "under color of federal office." To meet this prong, there need only be "a connection or association

---

authority to one contracting party to control a material economic term of the lease contract. *See* Ex. 67.

between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (citation omitted); *In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*"). The Removal Clarification Act of 2011 inserted the words "or relating to" into the federal officer removal statute, which "broaden[ed] the universe of acts that enable Federal officers to remove to Federal court." *Def. Ass'n of Philadelphia*, 790 F.3d at 467 (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425). Even before the Removal Clarification Act, a removing party was required only to "'demonstrate that the acts for which they [we]re being sued' occurred *at least in part 'because of* what they were asked to do by the Government.'" *Id.* at 471 (quoting *Isaacson*, 517 F.3d at 137) (emphasis added). The Act, however, "broadened federal officer removal to actions, not just *causally* connected, but alternatively connected or associated, with acts under color of federal office." *Latiolais*, 951 F.3d at 292; *see also Agyin*, 986 F.3d at 174 n.2 (noting that Congress's addition of the "or relating to" language was "intended to broaden" the statute's application).

161.    It is therefore not necessary "that the complained-of conduct itself was at the behest of a federal agency"; rather, it is "sufficient" if the Attorney General's "allegations are directed at the relationship between the [Defendants] and the federal government" for at least *some* of the time frame relevant to the Attorney General's claims. *Baker*, 962 F.3d at 944–45; *accord Def. Ass'n of Philadelphia*, 790 F.3d at 470–71; *Papp* v. *Fore-Kast Sales Co.*, 842 F.3d 805, 812–13 (3d Cir. 2016). For instance, in *Baker*, an analogous case, the federal officer removal statute applied where certain products that allegedly contributed to plaintiff's purported pollution-based harms had, at times, been "critical wartime commodities" subject to "price control[s]," detailed federal oversight, and mandatory orders "setting aside" a portion of the defendants' products for the government's own use. *Baker*, 962 F.3d at 940–41, 945. The defendants did not have to show

75

that federal officers directed the alleged pollution itself, or even the defendants' storage and waste disposal practices; rather it was "enough for the present purposes of removal that at least some of the pollution arose from the federal acts." *Id.* at 945. Similarly, in *Defender Association of Philadelphia*, the "for or relating to" element was satisfied even though the Federal Community Defender was not directed by the government in the specific conduct at issue in the suit (representing defendants in state post-conviction proceedings) because that conduct was "related to" acts that were done under federal direction (representing defendants in federal habeas proceedings). 790 F.3d at 471–72. And in *Papp*, the "for or relating to" element was satisfied in a failure-to-warn lawsuit where the defendant established a "connection" between manufacturing aircraft for the federal government and plaintiff's alleged asbestos exposure, even though the government had not directly prohibited the defendants from issuing asbestos-related warnings. 842 F.3d at 812–13.

162.    Courts in the Second Circuit have long taken a broad reading of the connection required for federal officer removal. As one court explained: "In *Isaacson*, it was enough that the contractual relationship [between defendants and the government] gave rise to [the plaintiff's harm], even if the contract did not call for it." *Gordon*, 990 F. Supp. 2d at 318; *see also Isaacson*, 517 F.3d at 137–38 (The hurdle erected by the "for or relating to" requirement is "quite low, as the statute does not require that the prosecution must be for the very acts" committed "under federal authority"). Under Defendants' theory of the case, the Attorney General's claims relate to numerous federal activities, especially when construed "in the light most favorable to" the existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 466, and giving Defendants the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 945.

163.    The Attorney General's suit, at its core, targets Defendants' production and supply of oil and gas—which includes oil and gas that Defendants extracted and produced under federal officers, *see supra* ¶¶ 106–110, as well as Defendants' subsequent promotion of that oil and gas. The Attorney General takes issue with Defendants' advertisements *because* they allegedly enabled Defendants to continue to produce and sell fossil fuels, which necessarily encompasses production of fossil fuels that Defendants carried out under the guidance, supervision, and control of the federal government.  By challenging Defendants' production, promotion, and sale of all oil and gas products, the Attorney General's allegations are necessarily "directed at the relationship between the [Defendants] and the federal government." *Baker*, 962 F.3d at 945 (internal quotation marks and citation omitted).   A clear "connection" or "association" thus exists between Defendants' extraction and production activities undertaken at the direction of federal officers to help carry out the federal government's objectives to bolster the country's military and economic security, and the Attorney General's claims attacking Defendants for those very activities. *See Latiolais*, 951 F.3d at 292.

164.    A recent decision from the Fourth Circuit, *County Board of Arlington County, Virginia*, confirms that the Attorney General's claims are "related to" Defendants' production and sale of oil and gas products under the direction and control of federal officers.  In *Arlington*, a municipality sued pharmacies in state court, asserting that they "caused an opioid epidemic" because "they were keenly aware of the oversupply of prescription opioids" but "failed to tak[e] any meaningful action to stem the flow of opioids into the communities." 996 F.3d at 248 (internal quotation marks and citation omitted).  The defendants removed to federal court on the ground that they operate the TRICARE Mail Order Pharmacy ("TMOP") as subcontractors, serving as part of a "federal health insurance program administered by DOD to 'provide[] medical care to current

and retired service members and their families.'" *Id.* at 248–49 (citation omitted).  Relying on the "guideposts" established in *Watson*, the Fourth Circuit applied the liberal policy favoring federal officer removal to conclude that the defendants "acted under" a federal officer "in operating the TMOP in accordance with the DOD contract." *Id.* at 248, 254.

165.    The Fourth Circuit reiterated that Congress has abandoned "the old 'causal nexus' test," such that a removing defendant need show only "a *connection or association* between the act in question and the federal office." *Id.* at 256 (emphasis added) (citations omitted).  Although the plaintiff in that case argued that "this requirement is not met" because the "Complaint did not even mention the distribution of opioids to veterans, the DOD contract or the operation of the [TMOP]," the Fourth Circuit held that this "position would elevate form over substance" insofar as "Arlington's claims seek monetary damages due to harm arising from 'every opioid prescription' filled by pharmacies" such as the ones operated by defendants. *Id.* at 256–57.

166.    So, too, here.  Although the Attorney General tries to characterize his claims as involving only alleged misrepresentations about oil and gas rather than the production and sale of those products (including to the federal government), this disregards the substance of the Complaint, which makes clear that the Attorney General seeks to hold Defendants liable for their continued extraction and production of fossil fuels in an effort to force Defendants to stop or dramatically reduce those activities.

167.    At a minimum, Defendants have shown that they are being sued, at least in part, "because of" their production and supply of oil and gas products under the direction, control, and supervision of the federal government, *Isaacson*, 517 F.3d at 137, and thus Defendants have acted "under color of federal office."

### 3.    *Defendants Have Colorable Federal Defenses.*

168.    "Courts have imposed few limitations on what qualifies as a colorable federal defense." *Isaacson*, 517 F.3d at 138. This element of the federal officer removal statute requires only that a defendant "raise a claim that is defensive and based in federal law." *Id.* (internal quotation marks and citations omitted).  Here, Defendants intend to raise several meritorious federal defenses, including the government-contractor defense, *see Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 504–14 (1988); *Maguire* v. *Hughes Aircraft Corp.*, 912 F.2d 67, 70 (3d Cir. 1990); federal immunity, *see Campbell-Ewald* v. *Gomez*, 577 U.S. 153, 166–69 (2016); preemption, *see Farina* v. *Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010); and others.

169.    For example, in *Boyle*, the Supreme Court applied a federal common-law government-contractor defense in a state-law product liability action because (1) the suit involved a unique federal interest; and (2) a state law holding government contractors liable for design defects in military equipment would present a significant conflict with federal policy. 487 U.S. at 504–13.  In addition, as the Court acknowledged in *Campbell-Ewald*, "[w]here the Government's 'authority to carry out the project was validly conferred,'" a contractor "who simply performed as the Government directed," may be immune from liability. 577 U.S. at 167 (quoting *Yearsley* v. *W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940)).  Here, Defendants produced oil and gas at the direction of the federal government, and thus have a colorable argument that they are immune from liability.

170.    Because the relief the Attorney General seeks would have "the practical effect" of "control[ling] conduct beyond the boundaries of [Vermont]," its claims are barred by the Commerce Clause, which "protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy* v. *Beer Inst.*, 491 U.S. 324, 336–37 (1989).  Similarly, imposing such extraordinary extraterritorial liability on lawful,

government-encouraged conduct would constitute "a due process violation of the most basic sort." *Bordenkircher* v. *Hayes*, 434 U.S. 357, 363 (1978). The foreign affairs doctrine also precludes exercises of state law that would "impair the effective exercise of the Nation's foreign policy." *Garamendi*, 539 U.S. at 419 (quoting *Zschernig* v. *Miller*, 389 U.S. 429, 440 (1968)). This prohibition extends to state-law causes of action. *See Pink*, 315 U.S. at 230–31 ("[S]tate law must yield when it is inconsistent with or impairs the policy or provisions of a treaty or of an international compact or agreement."). As explained above, the Attorney General's claims would interfere with the U.S. government's control of foreign policy, now and prospectively, including governmental efforts to address climate change and the allocation of costs through multilateral negotiations. *See In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 115, 119–20 (2d Cir. 2010).

171.    To the extent the Attorney General's claims target Defendants' statements about climate change policy, they are barred by the First Amendment. As the Supreme Court has held, lobbying activity is protected from civil liability. *See E. R.R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961); *United Mine Workers of Am.* v. *Pennington*, 381 U.S. 657, 671 (1965); *see also In re Dr. Reddy's Lab'ys, Ltd.*, 2002 WL 31059289, at *13 (S.D.N.Y. Sept. 13, 2002) (*Noerr-Pennington* immunity "encompass[es] state law . . . claims that arise from government action"). This is true even if "the campaign employs unethical and deceptive methods." *Allied Tube & Conduit Corp.* v. *Indian Head, Inc.*, 486 U.S. 492, 499–500 (1988).

172.    Accordingly, the Attorney General's claims are barred by the U.S. Constitution and related doctrines, including: the Interstate and Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3; Due Process Clauses, *id.* amends. V & XIV, § 1; *State Farm Mut. Auto. Ins. Co.* v. *Campbell*, 538 U.S. 408, 421 (2003); *BMW of N. Am.* v. *Gore*, 517 U.S. 559, 572–73 & n.19 (1996); derivative

sovereign immunity, *see Yearsley*, 309 U.S. at 20–21; and the foreign affairs doctrine, *see Pink*, 315 U.S. at 230–31.

173.    These and other federal defenses are more than colorable, and thus satisfy the test for federal officer removal under the statute. *See Willingham*, 395 U.S. at 407 (defendant invoking § 1442(a)(1) "need not win his case before he can have it removed"); *Isaacson*, 517 F.3d at 139 ("colorable" federal defense need not be "clearly sustainable" at removal stage because "the purpose of the statute is to secure that the validity of the defense will be tried in federal court"); *Gordon*, 990 F. Supp. 2d at 319 (noting that the "evidentiary standard" should not be "too high at the remand stage, given that the purpose of federal officer removal was to encourage the trial of such complex evidentiary questions in federal court"); *see also Cuomo* v. *Crane Co.*, 771 F.3d 113, 117 (2d Cir. 2014) (reversing remand in a failure-to-warn case where defendant produced asbestos materials for the government under "detailed and comprehensive specifications"; although such specifications "made no mention of asbestos warnings," the defendant had "provided sufficient evidence to create at this preliminary stage a 'colorable' possibility" of a federal defense). Federal officer removal under Section 1442 is therefore proper.

**IV.    This Action Is Removable Under the Outer Continental Shelf Lands Act.**

174.    This Court also has original jurisdiction under OCSLA. 43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline* v. *Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

175.    OCSLA grants federal courts original jurisdiction over all actions "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b). The "language" of § 1349(b) is "straightforward and broad." *In re Deepwater Horizon*, 745 F.3d 157,

163 (5th Cir. 2014). The OCS includes all submerged lands that belong to the United States but are not part of any State. 43 U.S.C. §§ 1301, 1331.

176.    Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources." *EP Operating Ltd.* v. *Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994). "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA." *Amoco Prod. Co.* v. *Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988). Indeed, OCSLA declares it "to be the policy of the United States that . . . the [OCS] . . . should be made available for expeditious and orderly development." 43 U.S.C. § 1332. The statute further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, to *the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the [OCS]." *Id.* § 1332(4) (emphasis added).

177.    Under OCSLA, the U.S. Department of the Interior administers an extensive federal leasing program aiming to develop and exploit the oil and gas resources of the federal OCS. *See* 43 U.S.C. § 1334 *et seq.* Under this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres. In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production." *The Impact of the President's FY 2017 Budget on the Energy and Min. Leasing and Production Missions of the*

*Bureau of Ocean Energy Management (BOEM), the Bureau of Safety and Environmental Enforcement (BSEE), and the Bureau of Land Management (BLM): Hearing Before the Subcomm. on Energy and Min. Resources of the H. Comm. on Nat. Resources*, 114th Cong. 3 (2016) (Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Mgmt., Dep't of the Interior) (hereinafter, "Hopper").[48]  In 2019, OCS leases supplied more than 690 million barrels of oil, a figure that has risen substantially in each of the preceding six years, together with 1.034 trillion cubic feet of natural gas. Bureau of Safety & Envtl. Enforcement, *Outer Continental Shelf Oil and Gas Production*, https://www.data.bsee.gov/Production/OCSProduction/Default.aspx (last updated Aug. 4, 2021).

178.    Defendants and their affiliates operate a large share of the more than 5,000 active oil and gas leases on nearly 27 million OCS acres administered by the U.S. Department of the Interior under OCSLA. *See* Hopper, *supra* ¶ 177.

179.    For example, from 1947 to 1995, Defendant Exxon Mobil Corporation produced more than one billion barrels of crude oil and more than five billion barrels of natural gas from the federal OCS in the Gulf of Mexico alone. *See* U.S. Dep't of Interior, Mins. Mgmt. Serv., Gulf of Mexico Region, Production by Operator Ranked by Volume (1947–1995), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%201947%20-%201995.pdf. In 2020, Exxon Mobil Corporation produced more than 12 million barrels of crude oil from the OCS in the Gulf of Mexico, while affiliates of Royal Dutch Shell plc produced over 139 million barrels of crude oil. *See* U.S. Dep't of Interior, Bureau of Safety & Envtl. Enforcement, Gulf of

---

[48]    The Court may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists. *See, e.g.*, *Plains Gas Sols., LLC* v. *Tenn. Gas Pipeline Co.*, LLC, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co.* v. *Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 608 (D. Del. 2011) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

Mexico    Region,    Production    by    Operator    Ranked    by    Volume    (2020), https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%202020.pdf.

180.    Moreover, OCSLA makes clear that oil and gas activities on the OCS can only be governed by federal law.  As the Supreme Court recently confirmed, "OCSLA defines the body of law that governs the OCS."  *Parker Drilling Mgmt. Servs., Ltd.* v. *Newton*, 139 S. Ct. 1881, 1887 (2019).   In particular, OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States" to the OCS.  43 U.S.C. § 1333(a)(1)(A).  Federal law applies "to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State."  *Id.*  Disputes under OCSLA may borrow from the law of adjacent states, but such claims remain creatures of federal law.  "[T]he civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the [OCS]."  *Id.* § 1333(a)(2)(A).

181.    A substantial part of the Attorney General's claims "arise[] out of, or in connection with," Defendants' "operation[s] conducted on the outer Continental Shelf" that involve "the exploration and production of minerals." *In re Deepwater Horizon*, 745 F.3d at 163.  The Attorney General's claims arise out of Defendants' OCS operations because fossil fuel production on the OCS is part of the production about which Defendants allegedly misled Vermont consumers.  The Complaint alleges that "Defendants' core businesses remain focused upon expanding the production, distribution, and sale of fossil fuel products that exacerbate climate change, and that any alternative energy efforts of the Defendants are miniscule in comparison."  Compl. ¶ 120. Indeed, a key component of the Attorney General's theory is that Defendants' alleged greenwashing is misleading because they have "continued to ramp up fossil fuel production, and to plan for unabated oil and gas exploration indefinitely into the future."  *Id.* ¶ 126.

182.   The Complaint also challenges Defendants' statements relating to their fossil fuel products regardless of where they were extracted or produced. *See* Compl. ¶ 43 (noting that "failure to reduce usage" of Defendants' fossil fuel products "would lead to potentially catastrophic effects to the climate, the environment, and the global economy, including significant changes in sea level, weather and ocean currents, extreme precipitation and drought, and resulting impact on and loss of ecosystems, communities, and people"); *id.* ¶ 180 ("[T]he continued increase in fossil fuel product consumption creates severe environmental threats and significant economic costs for communities, including the state of Vermont."). A substantial quantum of those fossil fuel products are extracted and produced from OCS operations. Therefore, the Attorney General's claims necessarily encompass all of Defendants' exploration, production, extraction, and development on the OCS and fall within the "broad . . . jurisdictional grant of section 1349." *EP Operating Ltd.*, 26 F.3d at 569.

183.   Moreover, Congress "intended" that "any dispute that alters the progress of production activities on the OCS," and thus "threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS," would fall within OCSLA's "grant of federal jurisdiction." *Amoco Prod. Co.*, 844 F.2d at 1210. Consistent with that intent, courts have repeatedly found OCSLA jurisdiction where the claims involved conduct that occurred on the OCS or if the resolution of the dispute could foreseeably affect the efficient exploitation of minerals from the OCS. *See, e.g.*, *EP Operating Co.*, 26 F.3d at 569–70; *United Offshore* v. *S. Deepwater Pipeline*, 899 F.2d 405, 406–07 (5th Cir. 1990). That is precisely the case here.

184.   Because resolution of this dispute foreseeably could affect the efficient exploitation of minerals from the OCS, this Court has jurisdiction under OCSLA. The Attorney General's ultimate goal is to eliminate or at least substantially reduce fossil fuel production

precisely because "the continued use of these products will cause catastrophic effects on the environment if unabated." Compl. ¶ 118. According to the Complaint, the alleged deceptive advertisements are purportedly material because without them consumers would have purchased fewer fossil fuels, or none at all, resulting in fewer greenhouse gas emissions. *Id.* ¶ 175 (alleging that consumers would "purchase and use Defendants' fossil fuel products less frequently, in lesser quantities, or not at all."); *see also id.* ¶¶ 183, 192. The Attorney General's requested relief— including civil penalties and a permanent injunction requiring Defendants to place climate change disclaimers at every gas pump—would likewise discourage OCS production, jeopardizing the federal government's leasing program, and impairing national energy security.

185.    Finally, OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims. *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163. This case is removable under OCSLA despite the Attorney General's artful pleading and ostensibly state-law claims. As the Supreme Court explained, the choice-of-law "question under the OCSLA" is not one of "ordinary" preemption. *Parker Drilling*, 139 S. Ct. at 1893. "OCSLA makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law." *Id.* (internal quotation marks omitted). Thus, the courts have affirmed removal jurisdiction where plaintiff's claims, "though ostensibly premised on [state] law, arise under the 'law of the United States' under" 43 U.S.C. § 1333(a)(2) such that "[a] federal question . . . appears on the face of [plaintiff's] well-pleaded complaint." *Ten Taxpayer Citizens Grp.* v. *Cape Wind Assoc.*, 373 F.3d 183, 193 (1st Cir. 2004). Accordingly, this lawsuit is removable under OCSLA.

## V.    This Action Arises Out of Federal Enclaves.

186.    This Court has original jurisdiction under the federal enclave doctrine.

187.    The Constitution's "Enclave Clause" authorizes Congress to "exercise exclusive Legislation in all Cases whatsoever" over all places purchased with the consent of a state "for the

Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful Buildings." U.S. Const., art. I, § 8 cl. 17. "A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331." *Jones* v. *John Crane-Houdaille, Inc.*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012).

188.    The "key factor" in determining whether federal enclave jurisdiction exists "is the location of the plaintiff's injury or where the specific cause of action arose." *Sparling* v. *Doyle*, No. EP–13–CV–00323–DCG, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014). The "[f]ailure to indicate the federal enclave status and the location of the exposure will not shield plaintiffs from the consequences" of "federal enclave status." *Fung* v. *Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992). Federal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave. *See Durham* v. *Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006 (finding defendant was permitted "to remove to federal court" because "some of [plaintiff's] claims arose on federal enclaves").

189.    Despite the Attorney General's artful pleading, it is apparent that the gravamen of the purported consumer harms at issue is Defendants' extraction, production, and sale of fossil fuels, and the alleged effects of climate change from the combustion of fossil fuel products. *See, e.g.*, Compl. ¶¶ 118, 168, 170. The Attorney General's true aim is to halt Defendants' oil and gas operations and thereby reduce fossil-fuel emissions. By targeting those operations, the Attorney General necessarily sweeps in those activities that occur on federal enclaves, including in Vermont. *See, e.g.*, *Humble Pipe Line Co.* v. *Waggonner*, 376 U.S. 369, 372–74 (1964) (noting that the United States exercises exclusive jurisdiction over certain oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Miss. River Fuel Corp.* v. *Cocreham*, 390 F.2d 34, 35 (5th Cir.

1968) (on Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States").

190.    Vermont contains multiple federal enclaves within its borders, including the Marsh-Billings-Rockefeller National Park, the Green Mountain National Forest, and several ports of entry and border inspection stations along the border of Canada and Vermont "created when Vermont ceded land to the federal government for the use of the Department of Customs." *State* v. *Garbutt*, 173 Vt. 277, 279 (2001).    In alleging that Defendants engaged in deceptive acts through the "promotion and selling of their fossil fuel products to Vermont consumers," Compl. ¶ 178, the Complaint necessarily sweeps in Defendants' allegedly misleading marketing directed at and viewed on those federal enclaves.

191.    And, although the Attorney General tries to disclaim holding Defendants "liable in connection with any marketing or sales of their fossil fuel products that may have occurred on federal lands," Compl. ¶ 6, the Complaint makes clear that it concerns "global warming and its consequences," *id.* ¶ 50, and complains about the "climate impacts of [Defendants'] fossil fuel products" based on emissions made around the world, *id.* ¶ 2.    Thus, the gravamen of the purported consumer harms is Defendants' extraction, production, and sale of fossil fuels, and the alleged effects of climate change from the combustion of fossil fuel products.    As a result, the Complaint necessarily sweeps in those activities that occur on federal enclaves.

192.    Moreover, the Attorney General alleges that climate change injuries will be suffered in federal enclaves within Vermont.    The Complaint alleges that "the continued use" of Defendants' fossil fuel products "will cause catastrophic effects on the environment if unabated" and "contribute to global warming, sea level rise, disruptions to the hydrologic cycle, increased extreme precipitation, heatwaves, drought, and other consequences of the climate crisis.    Compl.

¶¶ 118, 179; *see also id.* ¶ 180 (alleging that "the continued increase in fossil fuel product consumption creates severe environmental threats and significant economic costs for communities, including in the state of Vermont"). According to the Complaint, climate-related injuries will be suffered in places like the Green Mountain National Forest, where the federal government administers 410,690 acres of land.[49] *See* Compl. ¶ 1(c) ("Human-induced climate change is already affecting many weather and climate extremes in every region across the globe.").

193.    Because Vermont's claims arise partially on federal enclaves, this Court has original jurisdiction over this action.

## VI.    This Court Has Diversity Jurisdiction Because the Real Parties in Interest Have Diverse Citizenship.

194.    Defendants are also authorized to remove this action under 28 U.S.C. § 1441, based on diversity jurisdiction. This Court has original diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a), because the real parties in interest are citizens of different states, and the amount in controversy exceeds the value of $75,000.

195.    Federal district courts have "original," diversity jurisdiction over civil actions for which (1) there is "complete diversity," meaning that no plaintiff is a citizen of the same state as any defendant; and (2) the amount in controversy "exceeds the sum or value of $75,000." 28 U.S.C. § 1332(a); *Lincoln Prop. Co.* v. *Roche*, 546 U.S. 81, 89 (2005).

196.    "[C]omplete diversity" is present because the consumers and residents of Vermont and Defendants are citizens of different states. 28 U.S.C. § 1332(a)(1). For purposes of diversity

---

[49]    U.S. Forest Service, Land Areas of the National Forest System at 48 (Sept. 30, 2020), https://www.fs.fed.us/land/staff/lar/LAR2020/FY2020_LAR_Book.pdf.

jurisdiction, a corporation is a citizen of the state in which it is incorporated, and the state in which it has its principal place of business.  28 U.S.C. § 1332(c)(1).[50]

197.    Plaintiff, State of Vermont, is not a citizen of any state for purposes of diversity jurisdiction; however, it is a nominal plaintiff here.  The real parties in interest are consumers in Vermont.

198.    Diversity jurisdiction is determined by the real parties in interest, not merely the names on the face of a complaint.  *Navarro Sav. Ass'n* v. *Lee*, 446 U.S. 458, 460 (1980).  Accordingly, courts "must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy."  *Id.* at 461.

199.    A "real party in interest" is the "person who, according to the governing substantive law, is entitled to enforce the right."  *Oscar Gruss & Son, Inc.* v. *Hollander*, 337 F.3d 186, 193 (2d Cir. 2003) (quoting 6A Charles Alan Wright, et al., *Federal Practice & Procedure* § 1543, at 334 (2d ed. 1990)).  To determine the "real party in interest," courts look to the "essential nature and effect of the proceeding," not how the State attempts to characterize its claims.  *See Finkielstain* v. *Seidel*, 857 F.2d 893, 895 (2d Cir.1988) (internal quotation marks and citation omitted); *see also Philip Morris, Inc.* v. *Blumenthal*, 123 F.3d 103, 107 (2d Cir. 1997).

200.    Here, the State of Vermont has brought this suit on behalf of Vermont consumers. The Attorney General seeks injunctive relief, civil penalties, and other equitable relief on behalf of "Vermont consumers [who] have suffered substantial injury by reason of the financial cost of making purchases based on materially inaccurate and incomplete information about the products

---

[50]    The "in-state defendant rule" does not bar removal of this case because no Defendant is a citizen of Vermont, "the State in which [this] action is brought."  28 U.S.C. § 1441(b)(2).  Defendants are incorporated, headquartered, and have their principal places of business in states other than Vermont, or outside the United States.  *See* Compl. ¶¶ 9, 11, 13, 15–17, 19–23, 25.

in question." Compl. ¶ 192.  Where, as here, the State seeks relief on behalf of injured consumers, those consumers are the real parties in interest.  *See, e.g.*, *In re Baldwin-United Corp.,*770 F.2d 328, 341 (2d Cir. 1985) ("[W]hen the state merely asserts the personal claims of its citizens, it is not the real party in interest and cannot claim *parens patriae* standing"); *Connecticut* v. *Levi Strauss & Co.*, 471 F. Supp. 363, 371 (D. Conn. 1979) (the state "satisfies the citizenship requirement for diversity jurisdiction" when "Connecticut presents claims of individuals").

201.    Because the Complaint asks for Defendants to pay $10,000 for each of the many alleged violations of the Vermont Consumer Protection Act, *see* Compl. at 68, the amount in controversy far "exceeds the sum or value of $75,000," 28 U.S.C. § 1332(a)(1).  *See also Dart Cherokee Basin Operating Co., LLC* v. *Owens*, 574 U.S. 81, 89 (2014) (concluding that a defendant's notice of removal need include only a plausible allegation that the amount in controversy satisfies the jurisdictional threshold).  In addition, the Complaint seeks disgorgement of funds acquired as a result of any deceptive or unfair practices "to the extent that consumers would not have made such purchases, or would have made purchases in lesser quantities, if they had been given fair and honest disclosures regarding Defendants' products."  Compl. ¶ 192; *see also id.* at 68.  Disgorgement requiring Defendants to "return any ill-gotten gains" would be payable directly to the allegedly aggrieved consumers who purchased Defendants' products.  *Vastano* v. *Killington Valley Real Estate*, 996 A.2d 170, 172 (Vt. 2010).  Thus, the Attorney General is not seeking relief for Vermont consumers in general, but to restore the interests of certain individuals who allegedly would have refrained from purchasing gasoline at the fuel pump had they known about the connection between fossil fuels and climate change.

202.    The amount in controversy also incorporates the cost of complying with injunctive relief.  *DiTolla* v. *Doral Dental IPA of New York*, 469 F.3d 271, 276 (2d Cir. 2006) ("[I]n actions

for declaratory or injunctive relief . . . the amount in controversy is measured by the value of the object of the litigation.") (citing *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977)). Here, the Attorney General seeks injunctive relief that would independently satisfy the jurisdictional threshold. The Complaint alleges that Defendants have engaged "over a long period of time in numerous deceptive acts and unfair practices in connection with their marketing, distribution, and sale of gasoline and other fossil fuel products to consumers within the State." Compl. at 1. As a result, the Attorney General requests a permanent injunction "prohibiting Defendants from engaging in unfair or deceptive acts and practices described in the Complaint, and requiring Defendants to take appropriate steps to rectify their prior and ongoing unfair and deceptive acts and practices, *including without limitation the required disclosure of the role of fossil fuels in climate change at every point of sale in the State of Vermont*." *Id.* at 68 (emphasis added). Based on this request for injunctive relief, it is quite possible that a comprehensive disclosure regime to correct the alleged misrepresentations would cost millions of dollars.

203.    The Attorney General also seeks investigative and litigation costs and attorneys' fees, which are likely to be substantial. *See* Compl. at 68.

204.    Because the parties are completely diverse, and the amount in controversy exceeds $75,000, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

## **COMPLIANCE WITH OTHER REMOVAL REQUIREMENTS**

205.    Based on the foregoing, this Court has original jurisdiction of this action under 28 U.S.C. §§ 1331, 1332(a), 1441, 1442(a), and 43 U.S.C. § 1349(b)(1).

206.    The United States District Court for the District of Vermont is the appropriate venue for removal under 28 U.S.C. § 1441(a) because it is the federal judicial district encompassing the Superior Court of Vermont, Chittenden Unit where this suit was originally filed.

207.    Copies of all process, pleadings, and orders from the state-court action being removed to this Court that Exxon Mobil Corporation and ExxonMobil Oil Corporation have obtained from the Superior Court of Vermont, Chittenden Unit, and which are in the possession of Exxon Mobil Corporation and ExxonMobil Oil Corporation are attached hereto as Ex. 68. Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by ExxonMobil Corporation and ExxonMobil Oil Corporation in the action.

208.    Pursuant to 28 U.S.C. § 1446(d), Exxon Mobil Corporation and Exxon Mobil Oil Corporation will promptly file a copy of this Notice of Removal, as well as a Notice of Filing of this Notice of Removal, with the Clerk of the Superior Court of Vermont, Chittenden Unit, and serve a copy of the same on the Attorney General.  A copy of this filing (without exhibits) is attached as Ex. 69.  This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11, as required by 28 U.S.C. § 1446(a).

209.    Exxon Mobil Corporation and ExxonMobil Oil Corporation reserve the right to amend or supplement this Notice of Removal.  Exxon Mobil Corporation and ExxonMobil Oil Corporation also reserve all defenses and objections available under applicable law, and the filing of this Notice of Removal is subject to, and without waiver of, any such defenses or objections.

WHEREFORE, Exxon Mobil Corporation and ExxonMobil Oil Corporation respectfully give notice that this action is hereby removed from the Superior Court of Vermont, Chittenden Unit to the United States District Court for the District of Vermont.

DATE:  October 22, 2021

Respectfully submitted,

EXXON MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION,

By its attorneys,

Patrick J. Conlon*
patrick.j.conlon@exxonmobil.com
22777 Springwoods Village Parkway
Spring, TX 77389
Tel:  (832) 624-6336

DINSE P.C.

Ritchie E. Berger
rberger@dinse.com
209 Battery Street
Burlington, Vermont
05401
Tel: (802) 859-7029

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON, LLP

Theodore V. Wells, Jr.*
Daniel J. Toal*
twells@paulweiss.com
dtoal@paulweiss.com
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990

Justin Anderson*
janderson@paulweiss.com
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7300
Fax:  (202) 223-7420

*Pro hac vice forthcoming